UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

TRINA ROLLIE,                              CASE NO.: 00-6119-CIV-LENARD

     Plaintiff,                         Magistrate Judge TURNOFF

v.

VENATOR GROUP RETAIL, INC. ,f/k/a
KINNEY SHOE CORPORATION,
a New York Corporation and
VENATOR GROUP, INC., f/k/a
WOOLWORTH CORPORATION,
a New York Corporation,

     Defendants.
_____/

## PLAINTIFF'S MOTION TO DISQUALIFY

Plaintiff moves to disqualify the Honorable Joan Lenard as Judge in this action because Plaintiff fears she will not receive a fair trial on account of bias or prejudice against her attorney, Kelsay D. Patterson. The specific grounds in support of this Motion are:

1.  Pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455, a Judge should be removed from a case and another reassigned with a sufficient Affidavit has been filed in good faith due to a Judge's bias in favor or against a party or the party's attorney.

2.  A Judge should disqualify herself only if a reasonable person would question her impartiality or "where such pervasive bias and prejudice is shown

NON-COMPLIANCE OF S.D. Fla. L.R. 5.1M [1] ¶7.1 ¶4

by otherwise judicial conduct as would constitute bias against a party". <u>Davis v.</u>
<u>Board of School Commission of Mobile County</u>, 517 F. 1d 1044, (5th Cir. 1975);
<u>United States v. Sims</u>, 845 F. 2d 1564, 1570 (11th Cir. 1988). These two (2) cases
deal with the propriety of a Judge recusing herself irrespective of her being well
within the parameters of her judicial authority when her bias against a party
and/or the party's attorney is obvious and pervasive to a reasonable person.
These cases recognize that a Judge can construct an uneven playing field within
the scope and discretion of her power, and in turn, impose an impediment just as
challenging as the adverse party.

    3.  During a two and a half (2 ½) week employment discrimination jury
trial that commenced on August 25, 1999, the Plaintiff in that case felt as though
Judge Joan Lenard demonstrated dislike and bias against her lead attorney,
Kelsay D. Patterson, Esquire. Although that trial ended with a mistrial due to the
jury being unable to render a unanimous verdict, the Plaintiff was strongly
opposed to Judge Lenard presiding over her second trial. In furtherance of the
Plaintiff's sentiment, she directed her attorneys to file the appropriate Recusal
Motion and she attached her own personal Affidavit as required. (**See Exhibit 1**).
Although the jury was not supposed to indicate any numerical split in their
deliberations, the note that was read in open Court reflected a five to two (5 to 2)
split in the Plaintiff's favor. This split was further substantiated when the jury
foreperson contacted both defense counsel and Plaintiff's counsel. Irrespective of
the Plaintiff securing the majority of the jury's vote, she was afraid to proceed to

a second trial with the Honorable Judge Joan Lenard presiding over it. Shortly thereafter, she significantly compromised and settled her case.

4.  With respect to the case at hand, discussions between the undersigned and defense counsel have plainly demonstrated that the Defendant senses an advantage toward litigating against the undersigned due to the obvious dislike and contempt the Honorable Judge Joan Lenard had exhibited towards the undersigned. Although Debra Sharief's case prevailed against the Defendant's Summary Judgment Motion, defense counsel has expressed a **"certain confidence"** in a forthcoming Summary Judgment Motion despite the two (2) cases being nearly identical. To this end, all efforts to mediate and settle this matter will either be lopsided or thwarted due to the perception that all of the parties recognize.

5.  Moreover, the jury foreperson in the aforementioned Sharief trial, Meredith M. Mursuli, perceived a  bias and dislike exhibited by Judge Lenard against the undersigned. **(See Attached Affidavit-Exhibit 2)**.

6.  Other than the Recusal Motion filed in the Sharief case as previously mentioned, the undersigned has never filed any similar Motion in any County, Circuit, State, or Federal Court. **(See attached Affidavit-Exhibit 3).** The head equity partner and owner of the firm where the undersigned practices has attached his Affidavit as to his perception of the Judge's demeanor. **(See Exhibit 4).**

7.   This Affidavit is the Plaintiff's first and only like it, and is being filed together with this Motion in good faith pursuant to 28 U.S.C. §144. (**See attached Affidavit-Exhibit 5**).

8.   The Defendants will suffer no harm or bias at this stage. The discovery is at its infancy, and there are no other pending Motions before this Court. The Plaintiff desires that the Honorable Judge Joan Lenard recuse herself and reassign her case to another Judge so that the Defendant will reasonably assess her claims and contentions. In the event that the parties are unable to reach a compromise or settlement, the Plaintiff would like to feel confident that she will receive a fair and impartial trial. The Plaintiff does not feel as though she can receive a trial, nor have important dispositive Motions fairly assessed due to Judge Lenard's dislike for her lead attorney.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this __19th__, of May, 2000 to: Alan M. Gerlach, Esq., 390 N. Orange Avenue, Suite 1100, Orlando, Florida, 32801.

MICHAEL M. TOBIN, P.A.
1099 Ponce de Leon Boulevard
Coral Gables, FL 33134-3319
Ph: 305/445-5475
Fax: 305/445-5479

BY: _____
Kelsay D. Patterson
Florida Bar No. 119784

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI, DIVISION

00- 6119

CASE NO. ~~97-1731~~-CIV-LENARD

DEBRA SHARIEF,                    )          MAGISTRATE JUDGE TURNOFF
                                 )
           Plaintiff,            )
                                 )
v.                               )
                                 )
KINNEY SHOE CORPORATION,)
a New York corporation, et al.   )
                                 )
           Defendant.            )
_____)

### AFFIDAVIT

BEFORE ME, a person duly authorized to administer oaths and take

acknowledgments, personally appeared Debra Sharief, after being duly sworn

upon her oath deposes and says as follows:

1.  I am the Plaintiff in the civil action presently pending before The

Honorable United States District Court Judge Joan Lenard.

2.  Trial commenced on Wednesday, August 25, 1999, and concluded on

Thursday, September 9, 1999, approximately three (3) weeks in length.

3.  Judge Lenard declared a "mistrial" after two (2) days of deliberation

because the jury announced an inability to reach a unanimous verdict.

4.  I am concerned about obtaining a fair trial before Judge Lenard.

NON-COMPLIANCE OF S.D. fla. L.R.

1



5. After having personally observed the attitude and demeanor of Judge Lenard towards my counsel, Kelsay D. Patterson, Esquire, I feel by her conduct and attitude that she strongly dislikes him. There were several instances when she spoke harshly and with anger towards him. I personally felt that her expressed dislike towards him was so strong that it affected several rulings of law, objections, and the entire tone of the trial. Judge Lenard repeatedly reprimanded, rebuked, criticized, and demeaned my attorney.

Judge Lenard asserted herself in various places to assist defense counsel in arguing law and evidentiary issues while never once siding with or ruling for Mr. Patterson.

Treatment of the attorneys questioning of witnesses was not equal. Judge Lenard allowed the defense attorney to cross, re-cross and re-re-cross witnesses called during my case in chief. Mr. Patterson was denied any re-cross examinations except one single exception after he had to make considerable argument. Defendants attorney was allowed to ask leading questions on re-directs but Mr. Patterson was not afforded this privilege of leading for re-direct examinations.

I was relieved when the case resulted in a mistrial. The bias and dislike the Judge exhibited towards Mr. Patterson would have been obvious to any reasonable person observing the trial. I do not want Judge Lenard's animosity exhibited towards Mr. Patterson to affect my next jury trial. I perceive that it did play a pervasive and significant role in this trial.

6.  I harbor no negative feelings against Judge Lenard, my only concern is obtaining a fair trial. With Judge Lenard using my trial as the means for punishing my attorney due to a personality clash, my claims will suffer.

**FURTHER AFFIANT SAYETH NAUGHT.**

_[signature]_                                    11-1-99

Debra Sharief                                    Date
Affiant

**STATE OF FLORIDA**
**COUNTY OF DADE**

The foregoing instrument was acknowledge before me this 1st day of November, 1999, by Debra Sharief, who is personally known to me, or, produced a driver's license, and who did take an oath.

_[signature]_

Notary Public, State of Florida at Large

My Commission Expires: _____

> M. J. SEVILLA
> Comm. No. CC 610427
> My Comm. Exp. Dec. 29, 2000
> Bonded thru Pichard Ins. Agcy.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

TRINA ROLLIE,                          CASE NO.: 00-6119-CIV-LENARD

      Plaintiff,                      Magistrate Judge TURNOFF

v.

VENATOR GROUP RETAIL, INC. ,f/k/a
KINNEY SHOE CORPORATION,
a New York Corporation and
VENATOR GROUP, INC., f/k/a
WOOLWORTH CORPORATION,
a New York Corporation,

      Defendants.

_____/

### AFFIDAVIT

BEFORE ME, a person duly authorized to administer oaths and take acknowledgments, personally appeared Meredith M. Mursuli, after being duly sworn upon her oath deposes and says as follows:

1.  My name is Meredith M. Mursuli, and I reside at: 14411 NW 83rd Place, Miami Lakes, Florida, 33016. My social security number is: 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.

2.  From Wednesday, August 25, 1999, until Thursday, September 9, 1999, I was a juror in an employment discrimination trial in the matter of <u>Debra Sharief v. Kinney Shoe Corporation, et al.</u>, Case No. 97-1724-CIV-Lenard, in the United States District Court for the Southern District of Florida, Miami Division. The Honorable United States District Court Judge Joan Lenard presided over the trial. When the jury retired to deliberate over the evidence, I was chosen as the foreperson.

1





NON-COMPLIANT OF S.D. fla. L.R

3.   We were unable to reach a unanimous verdict after deliberating two (2) days. With a five to two (5-2) split in the Plaintiff's favor, we informed the Court of our deadlock. The trial was declared a "mistrial", and Judge Lenard informed us that the attorneys were interested in discussing our perceptions of the trial. We were told that any contact between ourselves and the attorneys would have to be initiated by us.

4.   I personally contacted Kelsay Patterson, Esquire, attorney for the Plaintiff, and Alan Gerlach, Esquire, attorney for the Defendant. In speaking to each of them on separate occasions, both were curious as to my perception of Judge Lenard's treatment of the attorneys. I advised them that it was obvious that Judge Lenard showed disdain and dislike for Mr. Patterson. Her manner and demeanor towards Mr. Patterson was one of annoyance. I do not recall her granting Mr. Patterson an opportunity for re-cross, while granting Mr. Gerlach re-cross examinations upon his every request. It seemed as though every objection made by Mr. Gerlach was sustained, while every objection made by Mr. Patterson was overruled. Her attitude towards Mr. Patterson demonstrated a pre-determined route for all of her rulings. When Judge Lenard spoke to Mr. Gerlach, her words were professional and respectful, yet warm and friendly. When she addressed Mr. Patterson, she was professional but terse and unfriendly to him. I thought that both Mr. Patterson and Mr. Gerlach were equally polite and deferential to Judge Lenard. For some inexplicable reason, she did not treat them equally.

5.   Any Plaintiff represented by Mr. Patterson is in a grave and unfortunate situation if their case is before Judge Lenard. Based upon my perceptions of the trial, her dislike for Mr. Patterson was pervasive and apparent to any reasonable person. In fact, all of us discussed Judge Lenard's obvious dislike for Mr. Patterson in the jury room during our deliberations. I do not think Mr. Patterson would ever get a fair trial before

Judge Lenard. A Judge's dislike and contempt for a lawyer should not work to the detriment of a party, and benefit his/her opponent.

6.   As jurors, Judge Lenard showed us courtesy, consideration, and respect. She was attentive to our needs and concerns and tried to accommodate us in every way.

7.   I agreed to provide this Affidavit voluntarily because I think that it is part of my responsibility to help preserve the spirit and integrity of our justice system.

**FURTHER AFFIANT SAYETH NOT.**

STATE OF FLORIDA
COUNTY OF DADE/BROWARD (Circle)

The foregoing  instrument was acknowledged before me this 8th day of

May, 2000 by Meredith Mursuli, who is personally known to me and/or produced Florida Drivers license as identification and who did take an oath.

NOTARY PUBLIC, State of Florida
at Large

My commission expires:

K D Patterson
My Commission CC812130
Expires February 24, 2003

3

1  9. N 961005978 ALDEREGUIA LOURDES

2  12. N 961007375 ALFONSO VELIA URANIA

3  720. Q 961402187 VAN OOTEGHEM KATHLEEN

4  570. Q 961320359 REDICK ELLEN L

5  459. Q 961256519 MENTORE SABERANA ELIZ

6  723. Q 961403623 MASEL ELNA

7  692. Q 961385247 TABLADA-ESTRAVIZ MURI

8  694. Q 961386394 TARNEJA RAJ SUKHARAJ

9  67. 6 961033503 BENZAN CASIA D

10  492. Q 961278724 NIEVES NOEL NELSON

11  596. Q 961336197 RODRIGUEZ MARIA ISABEL

382. Q 961215553 MURSULI MEREDITH M

13  491. N 961277861 NEWTON ELVETA VALERI

14  370. N 961209525 KOHN RONALD STUART

15  701. Q 961389267 THOMAS CARROL WILLOU

16  476. Q 961266088 MONZON ESTEBAN

17  415. Q 961234019 MACIAS GUSTAVO

18  605. Q 961339884 ROLLE ARNITRESS SHA

JUDGE
J. A. LENARD
18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

TRINA ROLLIE,                              CASE NO.: 00-6119-CIV-LENARD

     Plaintiff,                          Magistrate Judge TURNOFF

v.

VENATOR GROUP RETAIL, INC. ,f/k/a
KINNEY SHOE CORPORATION,
a New York Corporation and
VENATOR GROUP, INC., f/k/a
WOOLWORTH CORPORATION,
a New York Corporation,

     Defendants.

_____/

## AFFIDAVIT

BEFORE ME, a person duly authorized to administer oaths and take

acknowledgments, personally appeared Kelsay D. Patterson, Esquire, after being duly

sworn upon his oath deposes and says as follows:

1.  On Wednesday, August 25, 1999, in the United States District Court for the

Southern District of Florida, Miami Division, an employment discrimination trial began

in the Court of the Honorable United States District Court of Judge Joan Lenard, Case

Number 97-1724-CIV-Lenard, <u>Debra Sharief v. Kinney Shoe Corporation</u>. I was lead trial

counsel for the Plaintiff, and the trial lasted approximately two and a half (2 ½ ) weeks

in length.

2.  Judge Lenard declared a "mistrial" after two (2) days of deliberation because

the jury announced an inability to reach a unanimous verdict. During the course of

 1



Debra Sharief's trial, I felt as though Judge Lenard's actions and demeanor towards me was unprofessional, offensive, hostile, and ill spirited. Her dislike for me was unlike anything I have ever experienced in any courtroom in my career. Judge Lenard denied every request I made for any re-cross examination except one (1) single exception after considerable lengthy arguments at sidebar. Each and every single request made by defense counsel for re-cross, and re-re-cross examination were granted by Judge Lenard. (See August 27, 1999 trial transcript page 62, line 2 through page 64 line 14; and see page 78). During re-direct examinations, defense counsel was afforded the opportunity to lead key witnesses to their answers while consistently overruling my objections based upon "leading".

Nearly every objection made by the Defendant was sustained. Nearly every ruling sought by the Defendant was granted. On occasion when I was being insulted and reprimanded by the Court, defense counsel actually came to my assistance to soothe the Court due to its unprovoked hostility directed towards me. The parties were at sidebar trying to schedule a date for the attorneys to meet in order to review jury instructions. When I advised the Court that both defense attorneys and I had reached an agreement for scheduling the aforementioned meeting, Judge Lenard personally interrupted my sentence and reprimanded me for being "selfish and only thinking of [yourself], what about Mr. Gerlach's plans?" Thankfully Mr. Gerlach then inserted himself into the discussion to again advise her that we had reached a mutually agreed upon date and time for the meeting. Not only did Judge Lenard fail to apologize for the condescending unprofessional remark she made about me but I began to think of the defense attorney as an ally in helping me to receive professional treatment before the Court.

3.   At the conclusion of the trial,  Judge Lenard provided our telephone numbers to the jurors giving them the option of contacting the lawyers to discuss their own individual perceptions of the trial. The jury foreperson, Meredith Mursuli, contacted me within twenty-four (24) hours of the trial's conclusion. She indicated that the bias and dislike exhibited towards me by Judge Lenard was pervasive, obvious and apparent to herself and the rest of the jury. She agreed to provide an Affidavit to that effect because she questioned whether any Plaintiff who has suffered a civil transgression could ever receive a fair trial with me as their attorney and Judge Lenard presiding over the trial.

4.   Debra Sharief, the Plaintiff in that trial, filed her own Affidavit asking Judge Lenard to disqualify herself from her case shortly after the conclusion of the trial. Ms. Sharief's Affidavit attached to her Motion to Disqualify demonstrates the impact exacted upon her trial that she believed was due to the disdain that Judge Lenard exhibited towards me.

5.   Attached to this Affidavit is a portion of the trial transcript from August 30, 1999. During the examination of Paul Campbell, Judge Lenard provided defense counsel responses to the Plaintiff's hearsay objections. The record is evident that defense counsel was flustered and could not phrase a response, but Judge Lenard impressed upon him the "appropriate way" to characterize his response in order for her to continue rendering rulings of admissibility in his favor. (See page 6, line 20 through page 8 line 23; see also next objection page 12, line 18 through 25). ).

The trial record is replete with instances when defense counsel made procedural errors in attempting to show and publish documents to the jury prior to them having been admitted into evidence.  However, the only evidentiary procedural mistake made by me in good faith turned into one of the most demeaning reprimands I

3

have ever received in my life. Although the cold hard record reflects the reprimand, it does very little to illustrate the exchange as it truly transpired. (See page 15, line 8 through page 22, line 4).

6.   I have never sought or filed any pleading to have any Judge disqualified and/or recused from any case I have ever handled. I do not believe that any Plaintiff with me as their attorney will receive a fair and impartial trial before the Honorable Judge Joan Lenard. This sentiment is especially true as all of the key significant witnesses, lawyers, and the facts are either similar or identical with respect to the Plaintiff's case in comparison to Debra Sharief's case. Furthermore, the representations personally made to me by a lawyer for the Defendant indicated that an advantage is perceived due to Judge Lenard's hostility and dislike towards me.

**FURTHER AFFIANT SAYETH NOT.**

STATE OF FLORIDA
COUNTY OF DADE/BROWARD (Circle)

The foregoing instrument was acknowledged before me this _____ day of _____, 2000 by _KELSAY D. PATTERSON_ who is personally known to me and/or produced _____ as identification and who did take an oath.

NOTARY PUBLIC, State of Florida
at Large

Michael M Tobin
My Commission CC716623
Expires February 15, 2002

My commission expires:

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

[illegible plaintiff name],                    CASE NO.
                                               00-06119-CIV-HUCK
                Plaintiff,
                                               Miami, Florida
       v.                                      [illegible date]

KELLEY BROS. CORPORATION and
ACCUSORTH CORPORATION,

                Defendants.
- - - - - - - - - - - - - - - - - - - - -x


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOHN A. LENARD
and a jury


APPEARANCES:

For the Plaintiff:        [illegible] PATTERSON, ESQ.
                          [illegible] R. [illegible], ESQ.



For the Defendant:        ALAN GRAHAM, ESQ.
                          BILL [illegible], ESQ.





Court Reporter:           Richard A. [illegible], C.S.R.R.

RECROSS EXAMINATION

BY MR. GERLACH:

Q.   Isn't it true that is it possible . . .

. . . . . .

. . . . . .

A.   That depends on what . . . --

Q.   Yes or no, is it possible or not.

        MR. PATTERSON:   If the question does not call for a
yes or no, it is impossible to answer with a yes.

        THE COURT:   It called for a yes or no answer.  Answer
the question.

BY MR. GERLACH:

Q.   Is it possible for a manager to get a bigger bonus in a
lower volume store than in a higher volume store?

A.   I don't think that is a possible . . . question.  If you
understand the bonus structure, it is not right or . . . question.

Q.   Let me try to help.  We have different . . . pay -- would
you agree with me that there is a base pay all Lady Foot
Locker employees get?

A.   But it is not the same between the stores.

Q.   There is what . . . about all Lady Foot Locker managers get?

A.   Depending on the amount of business you gain.

Q.   Isn't it true you can get a higher bonus in a lower volume
store than a higher volume store depending on the amount of
business you gain?

A.   Yes, but it also holds true for the salary also, so we

```
 1    could look at the break even, if they have a lower volume store
 2    above you as a bonus store, and you bonus on a million
 3    dollar store and you had a store, your store is in a
 4    particular start where you still do a quarter or a million
 5    less on the store.
 6             If you look at the pay pattern, no, I wouldn't make
 7    more bonus than a higher volume store.  It is only if I
 8    increase the business in that store.
 9    Q.  You just referred when the volume has increased in the
10    Westland Mall store?
11    A.  Yes.
12    Q.  So you did get increases in bonus in the Westland Mall
13    store?
14    A.  Yes, I never dispute that.
15    REDIRECT EXAMINATION
16    BY MR. PATTERSON:
17    Q.  Assuming you had been given the position at Dadeland in
18    August of 1997 as you testified because it is a higher volume
19    store, your base pay would have been increased?
20    A.  Correct.
21    Q.  Would it have been your intention to raise the store's
22    volume beyond what it already was?
23    A.  Absolutely.
24             MR. PATTERSON:  Nothing further.
25             THE COURT:  You may step down.
```

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION

 3
      DEBRA SLAKMAN,                          )    Docket No.
 4                                            )    97-1714-CIV-LENARD
                    Plaintiff,                )
 5                                            )    Miami, Florida
          v.                                  )    August 30, 1996
 6                                            )
      KINNEY SHOE CORPORATION and             )
 7    WOOLWORTH CORPORATION,                  )
                                              )
 8                  Defendants.               )
                                              )
 9    ----------------------------------------X

10
      TRANSCRIPT OF TRIAL EXCERPT
11    BEFORE THE HONORABLE JOAN A. LENARD
      and a jury
12


13

14    APPEARANCES:

15    For the Plaintiff:      KELSAY PATTERSON, ESQ.
                              MICHAEL M. TOBIN, ESQ.
16

17

18    For the Defendant:     ALAN GERLACH, ESQ.
                             NEIL McGUINNESS, ESQ.
19

20

21

22

23
      Court Reporter:       Richard A. Kaufman, C.M.R.R.
24

25
```

RICHARD A. KAUFMAN, RMR, NP

6

1    boss, the senior vice president of human resources at that time

2    John Koslowk..

3    Q.   What did you do in response to the letter you had received?

4    A.   As soon as I received the letter, I spoke to Ms. Davenport

5    regarding the letter and my direct supervisors.   Then I

6    contacted Ms. Sharief by phone.

7    Q.   During the course of your investigation, how many times did

8    you speak with Ms. Sharief?

9    A.   It is difficult to say, but if I had to guess, I would say

10   about eight times.

11   Q.   Did you have any other communication with her at the

12   outset?

13   A.   I am not sure.

14   Q.   Did you send her a letter?

15   A.   Yes.   I did send her a letter which is standard, to let her

16   know we received her complaint and that the company took her

17   complaint seriously and would investigate it and at the

18   conclusion would inform her that we had completed this

19   investigation.

20   Q.   Mr. Campbell, I will hand you what we previously marked as

21   Defendant's Exhibit 53.   Could you read for the jury the

22   contents -- let me first ask you  this.

23            Is this the letter you just described?

24   A.   Yes.

25            MR. GERLACH:   I move its introduction into evidence.

1          MR. PATTERSON:  Objection on the basis of hearsay.

2    Out of court testimony.

3          THE COURT:  Come up, please.

4          (Side bar.)

5          THE COURT:  Let me see the letter.

6          What is the basis of your objection?

7          MR. PATTERSON:  Classic hearsay.  Out of court

8    documents being introduced for the truth of the matter

9    asserted.  There is no exception.  He is here.  He can testify.

10   It is hearsay.

11         MR. GERLACH:  It is obviously offered for a

12   non-hearsay purpose.  He made the big point nobody contacted

13   me, nobody paid attention to me.  It wasn't until I mentioned

14   him on my cross examination that she mentioned him.

15         MR. PATTERSON:  It is hearsay.

16         MR. GERLACH:  The time for objection to exhibits is

17   at the time of the pretrial statement.

18         MR. PATTERSON:  That is not true.

19         He can ask what he did --

20         THE COURT:  Lay your predicate.

21         You are not offering it for the truth of the matter;

22   is that what you said?

23         MR. GERLACH:  I am not offering -- I don't understand

24   the truth of the matter.  I am certainly not offering it to

25   validate the truth of the allegations that are made.  I am

8

1  offering it so the jury will see there was an actual letter in

2  response to her complaint.  We are not saying the allegations

3  were substantiated.

4          MR. PATTERSON:  He can testify about his

5  investigation, that is why the witness is here.

6          THE COURT:  How did your letters get in?

7          MR. PATTERSON:  Your Honor to make me defend my

8  evidence --

9          THE COURT:  I am trying to understand the evidentiary

10  difference between the letters that the plaintiff sent and the

11  letters he sent.

12          MR. PATTERSON:  Mr. Gerlach made an objection to Trina

13  Rollie's letter.

14          THE COURT:  That is a different basis.

15          MR. PATTERSON:  What letter do I have to defend now --

16          THE COURT:  You don't have to defend anything.

17          MR. GERLACH:  This is a response to the letter from

18  Davenport.

19          THE COURT:  I will allow it in and overrule the

20  objection.  It is not coming in for the truth of the matter

21  asserted.  It is in response to her letter.

22          (Open court.)

23          THE COURT:  Overruled.

24          What was the exhibit number?

25          MR. GERLACH:  59.

1  retaliatory financial audit brought to your attention?

2  A. Yes.

3  Q. What did you do with respect to that?

4  A. I contacted the auditing department and at that time I

5  asked them how was the scheduling done because that was very

6  important to me. Was it done arbitrary or do we have people

7  out there that are just making decisions and it was very

8  concerning to me because I wanted to make sure she was neither

9  singled out or particularly being retaliated against because

10  she brought an allegation to us.

11          In reviewing the documentation and speaking to the

12  people in the auditing department, I found out it was based on

13  certain criteria that you had to hit on and once you had

14  repeated -- there was a standard level of performance like for

15  example your returns or your bank deposits. Certain things had

16  a base line and if you deviated from that base line, that would

17  be a red flag and they would do a spot-check audit.

18  Q. Did request an explanation from the audit department why a

19  spot check had been done?

20  A. Yes.

21  Q. Did you get a response?

22  A. Yes. The response was that Ms. Sharief --

23          MR. PATTERSON: Objection, hearsay.

24          MR. GERLACH: It is not offered for hearsay purpose.

25          THE COURT: Overruled.

15

1    that way strongly.

2                My response letter to Ms. Sharief --

3    Q.  Let me go ahead and hand you what has been marked as

4    Defendant's Exhibit 64.

5                Did you send Ms. Sharief a letter advising her of your

6    conclusions?

7    A.  Yes.

8    Q.  Is that the letter in front of you?

9    A.  Yes.

10               MR. GERLACH:  I would like to move that into evidence

11   as Defendant's 64.  Actually 65 is the same thing but I would

12   move in 64.

13               MR. PATTERSON:  No objection.

14               THE COURT:  It will be admitted as Defendant's Exhibit

15   64.

16                      (A document was received in

17               evidence as Defendant's Exhibit 64.)

18   BY MR. GERLACH:

19   Q.  Was this letter sent to her at her home?

20   A.  Yes.

21   Q.  Was that true also of your earlier letter?

22   A.  Yes.

23   Q.  Publish to the jury your letter to Ms. Sharief dated April

24   10, 1996?

25   A.   "Dear Debra.  The investigation into the allegations you

```
 1    brought against district manager Jeff Bjork has been completed.

 2    As a result of the investigation, appropriate action has been

 3    taken.  If at any time in the future you experience any

 4    behavior on the part of any Woolworth employee that makes you

 5    feel uncomfortable, please contact the Fair Employment Practice

 6    Department immediately at 1(800) Fair for You.

 7            Please remember, this is a confidential investigation

 8    and should only be disclosed with those individuals with a

 9    legitimate business need to know.

10            Also, this investigation does not mean you are immune

11    to disciplinary action by any of your supervisors and it also

12    does not mean that this department will tolerate any

13    retaliation against you.

14            As a store manager, you are obligated to perform your

15    duties which has been set forth for you in your job description

16    and by your district manager.

17            If at any time you feel that discriminatory action

18    against you is of a retaliatory nature, contact the fair

19    employment practice department immediately.

20            Thank you for your cooperation during this

21    investigation and for bringing your concerns to the attention

22    of Cathy Davenport.  Sincerely Paul Campbell," with a copy to a

23    number of people.

24    Q.  Mr. Campbell, were you sincere in encouraging her to report

25    any acts of discriminatory or retaliation acts that she thought
```

RICHARD A. KAUFMAN, RMR, NP

17

1    were like that in the future?

2    A.  Absolutely.

3    Q.  Did you at any time contact Mr. Bjork in writing with the

4    results of your investigation?

5    A.  Yes.  I also sent Mr. Bjork a letter informing him we had

6    reached a conclusion in the investigation.

7    Q.  Was that the end of the matter?

8    A.  No.  It was my determination since Ms. Sharief had

9    expressed in her original claim Mr. Bjork had made those

10   statements, in reviewing my record I couldn't find an exact

11   date when Mr. Bjork went through training, so as a result of

12   that, to my personal liking anyway, I like to see everyone take

13   training at least once every two years for several reasons.

14   Sometimes it is updated and just as a refresher thing, so that

15   was one of my recommendations, that Mr. Bjork got some

16   training.

17   Q.  What type of training?

18   A.  We have a type of training practiced by the company.  The

19   three that I recommended he take, one was value of managing

20   diversity and that was a course having to do with race

21   discrimination, national origin discrimination.  Preventing

22   sexual harassment, the second one, and the third one was

23   rightful discharge.

24   Q.  If Mr. Bjork hadn't done anything wrong, why did you

25   require him to take these courses?

15

1              MR. PATTERSON:  Objection, leading.

2              THE COURT: Sustained.

3              Rephrase your question.

4    BY MR. GERLACH:

5    Q.  Why did you request Mr. Bjork take these courses?

6    A.  I really believe that -- Ms. Charief felt she was

7    discriminated against in her letter.  I could not find in my

8    records when Mr. Bjork had taken this training.  It was very

9    important to me not only professionally and personally there

10   was no misunderstanding in Mr. Bjork's mind going forward of

11   what the company policy on these issues were.  Granted there

12   wasn't enough information or evidence to prove he had done some

13   of the things, some of the conclusions Ms. Charief had reached,

14   but nonetheless, had he had a second offense of something

15   further, I wanted to make sure I could say Mr. Bjork, not only

16   did we go through this before but I sent you to training and

17   you acted inappropriately.

18             So I wanted to make sure that he went to training if

19   for no other reason, so he had a refresher course.

20   Q.  How did you insure if you did that Mr. Bjork went about the

21   training?

22   A.  I think the letter I sent to him I asked him to contact the

23   training department for training.

24   Q.  Who delivered the training to Mr. Bjork?

25   A.  I did.

RICHARD A. KAUFMAN, RMR, MP

19

1    Q.   You did it personally?

2    A.   Yes.

3    Q.   Why?

4    A.   We have a training schedule and the training department is

5    separate the Fair Employment Practice Department and we have a

6    training schedule that is the set up months ahead, and I felt

7    Mr. Newman who I had asked to do the training couldn't do it in

8    a timely enough fashion for me; so I was out and I think at

9    that time I was going out west and I decided to fly back

10   straight here to Miami to give Mr. Bjork those courses which I

11   taught many, many times before.

12   Q.   How long did the training take?

13   A.   It took a full day.

14   Q.   Was anyone present besides yourself and Mr. Bjork?

15   A.   No.

16   Q.   One on one?

17   A.   One on one training.

18   Q.   Did you have any further involvement with Mr. Bjork and

19   Ms. Sharief?

20   A.   Yes.

21   Q.   Did you receive any documents from Mr. Bjork vis-a-vis

22   personnel evaluation?

23   A.   Yes.

24   Q.   Could you describe for the jury what document you received

25   and what comment you had in response to receiving it?

1    A.   It was my sense that Ms. Sharief didn't feel that Mr. Bjork

2    was somebody that they saw eye to eye on and during the

3    evaluation period, I knew that was coming in since my letter to

4    Ms. Sharief was on the 10th, May is usually at the evaluation

5    time so I contacted Mr. Bjork and said I would like to review

6    the evaluation before he gave it to her.   I wanted to make sure

7    that everything he had in the evaluation could be justified by

8    fact or by performance.

9         He actually faxed me a copy of the evaluation.   I

10    reviewed it with him.

11    Q.   Did your review of the evaluation with Mr. Bjork establish

12    to your satisfaction it was non-discriminatory?

13    A.   Yes.   In any evaluation there is a certain sense of

14    subjective.   It is an evaluation -- we always do a self

15    evaluation.   Associates do their evaluation and give it to the

16    supervisor.   The supervisor in turn will do the real

17    evaluation.

18         It is a perceptive function.   I perceive my particular

19    function one way and the supervisor perceives it another way.

20         What I wanted to do was make sure Mr. Bjork was really

21    looking objectively at Ms. Sharief's performance although I

22    wasn't there and didn't observe it from a day-to-day basis, so

23    a certain flavor of it would have to be his view of her

24    performance.

25    Q.   Do you recall what overall evaluation Mr. Bjork gave her

RICHARD A. KAUFMAN, RMR, NP

31

1    for year ending 1995 in May of 1996?

2    A.   No, I can't remember.  I know it was not a bad evaluation.

3          THE COURT:  Mr. Gerlach, we will break at this time.

4          Ladies and gentlemen do not discuss this case either

5    amongst yourselves or anyone else.  Have no contact whatsoever

6    with anyone associated with the trial.  Do not read or listen

7    to anything touching on this matter in any way.  Be back in the

8    jury room tomorrow afternoon at 1:30.

9          Have a nice afternoon and evening.  We will see you

10   tomorrow at 1:30.

11         (Jury leaves room.)

12         MR. GERLACH:  This is the witness through whom we

13   would be doing some of the after acquired evidence foundation.

14         THE COURT:  Have I ruled on that issue?

15         MR. GERLACH:  I believe the Court reserved ruling on

16   it over the weekend.

17         THE COURT:  Okay.

18         MR. GERLACH:  The Court wanted a proffer or detailed

19   explanation what was going to be done and this was the witness.

20         THE COURT:  Do you want to give me the proffer this

21   afternoon?

22         MR. GERLACH:  Whatever the Court desires.  I am

23   advising the Court although we are not at the point I would

24   ordinarily do that, this is the witness through whom I will be

25   doing it is.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

TRINA ROLLIE,

      Plaintiff,

v.

VENATOR GROUP RETAIL, INC. ,f/k/a
KINNEY SHOE CORPORATION,
a New York Corporation and
VENATOR GROUP, INC., f/k/a
WOOLWORTH CORPORATION,
a New York Corporation,

      Defendants.

_____/

CASE NO.: 00-6119-CIV-LENARD

Magistrate Judge TURNOFF

## **AFFIDAVIT**

BEFORE ME, a person duly authorized to administer oaths and take acknowledgments, personally appeared Michael M. Tobin, Esquire, after being duly sworn upon his oath deposes and states as follows:

1. I am currently practicing law at 1099 Ponce de Leon Boulevard, Coral Gables, Florida. I have been practicing law since my admission in June 1953. I am primarily involved in personal injury, wrongful death, and insurance litigation as an active trial attorney.

2. That I was present and assisted Attorney Kelsay D. Patterson and acted as second chair in the trial of subject law suit before the Honorable Joan Lenard.

3. That I observed that the attitude of Judge Lenard toward Mr. Patterson as expressed in words, body language and facial expression demonstrated a dislike for him personally or the manner in which he conducted himself.

1



4.  I have the personal opinion from my observations of the conduct of the trial before Judge Lenard that Mr. Patterson's client would have the perception that there is some strong underlying feeling on the part of Judge Lenard and that the client could not obtain a fair and impartial trial,  and that I could not see any way that Mr. Patterson could do anything to ameliorate this situation.

5.  That I have employed Kelsay D. Patterson as an associate attorney with my law firm for the past three (3) years.  He has assisted me in trial on a number of occasions and has twice taken the role of first chair.  In both instances where I assisted him, he has received laudatory compliments from the trial judges making unsolicited comments to me on his competency and capability as a trial attorney and expressed the opinion that he has a brilliant future ahead of him as a trial attorney.

**FURTHER AFFIANT SAYETH NOT.**

STATE OF FLORIDA
COUNTY OF DADE/BROWARD (Circle)

The foregoing  instrument was acknowledged before me this 19th day of May, 2000 by Michael Tobin , who is personally known to me and/or produced_____ as identification and who did take an oath.



**NOTARY PUBLIC, State of Florida**
**at Large**

My commission expires:

K D Patterson
My Commission CC812130
Expires February 24, 2003

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

TRINA ROLLIE,                                      CASE NO.: 00-6119-CIV-LENARD

     Plaintiff,                                  Magistrate Judge TURNOFF

v.

VENATOR GROUP RETAIL, INC. ,f/k/a
KINNEY SHOE CORPORATION,
a New York Corporation and
VENATOR GROUP, INC., f/k/a
WOOLWORTH CORPORATION,
a New York Corporation,

     Defendants.
_____/

## AFFIDAVIT

BEFORE ME, a person duly authorized to administer oaths and take acknowledgments, personally appeared Trina Rollie, after being duly sworn upon her oath deposes and says as follows:

1. I am the Plaintiff in a civil action presently pending before the Honorable United States District Court Judge Joan Lenard.

2. On Friday, August 25, 1999, I testified as a fact witness on behalf of Debra Sharief in her employment discrimination trial case against Kinney Shoe Corporation that was presided over by Judge Lenard. Case Number 97-1724-CIV-LENARD, <u>Debra Sharief v. Kinney Shoe Corporation, et al.</u>

3. Both during and after the conclusion of Ms. Sharief's jury trial, Ms. Sharief repeatedly informed me that Judge Lenard's dislike for her attorney, Kelsay D. Patterson, Esquire, was pervasive and glaring. She advised me that Judge Lenard's





demeanor towards Mr. Patterson was unforgiving, and she seemed to take pleasure in disciplining, and insulting him when given any opportunity.

4.   Upon being advised by my attorney that my case had been assigned to Judge Lenard's division, I felt apprehensive and nervous. Upon being advised of defense counsel's representations and confidence due to Judge Lenard presiding over my case, I am greatly concerned that my case will be the means that Judge Lenard will use to further exact more punishment intended for Mr. Patterson. I am also disturbed that the Defendant sees this situation as advantageous to their defenses.

5.   My confidence in Judge Lenard presiding over my case is further diminished after having read the Affidavit of the jury foreperson in Debra Sharief's case.

6.   I harbor no negative feelings towards Judge Lenard, my only concern is receiving a fair trial. I do not believe I will receive a fair trial nor have dispositive motions such as Summary Judgment Motions fairly and impartially assessed with Judge Lenard presiding over my case.

**FURTHER AFFIANT SAYETH NOT.**

STATE OF FLORIDA
COUNTY OF DADE/BROWARD (Circle)

The foregoing instrument was acknowledged before me this 17 day of

May, 2000 by Trina Rollie, who is personally known to me and/or

produced_____ as identification and who did take an oath.

**NOTARY PUBLIC, State of Florida**
**at Large**

My commission expires:

K D Patterson
My Commission CC812130
Expires February 24, 2003

2