NIGHT BOX
FILED
MAY 30 2000
CLERK, U.S.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TRINA ROLLIE,

Plaintiff,

v.

VENATOR GROUP RETAIL, INC., f/k/a KINNEY SHOE CORPORATION, a New York Corporation and VENATOR GROUP, INC., f/k/a WOOLWORTH CORPORATION, a New York Corporation,

Defendants.

/

CASE NO. 00-6119-CIV-LENARD
Magistrate Judge TURNOFF

**DEFENDANT'S MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFF'S MOTION TO DISQUALIFY**

Plaintiff's Motion to Disqualify reflects a factual misperception and an erroneous analysis of the law. If granted, it will set a precedent for a dangerously low threshhold for recusal of a federal district judge.

Plaintiff's attorney seems bewildered at the source of the occasional clash between counsel and Court during the 15-day Sharief trial. As indicated in the Affidavit filed herewith, the undersigned had never met or spoken with Judge Lenard prior to the docket sounding in that case. She had absolutely no previous disposition in favor of the undersigned or the defendants Kinney and Woolworth. Rather than stemming from any recusable bias or previous position, any conflict between counsel and the Court resulted from antagonism created by improper activity by counsel in the earlier portion of the trial. Although memory can fade, three especially salient earlier errors involved a belated Batson challenge, improper opening statement, and the manner

of presenting testimony from Plaintiff's economic expert, Dr. Bernard Pettingill. See Affidavit, paragraph 4, submitted herewith.

The undersigned has searched the transcript excerpt attached to Exhibit 3 (Patterson Affidavit) to Plaintiff's Motion in vain, in search of his own supposed bumbling and the Court's supposed rescue therefrom. Mr. Patterson objected to the introduction into evidence during Paul Campbell's testimony of a letter Mr. Campbell had written to the Plaintiff. The entire colloquy at side bar follows:

> (Side bar.)
>
> THE COURT: Let me see the letter.
>
> What is the basis of your objection?
>
> MR. PATTERSON: Classic hearsay. Out of court documents being introduced for the truth of the matter asserted. There is no exception. He is here. He can testify. It is hearsay.
>
> MR. GERLACH: <u>It is obviously offered for a non-hearsay purpose</u>. He made the big point nobody contacted me, nobody paid attention to me. It wasn't until I mentioned him on my cross examination that she mentioned him.
>
> MR. PATTERSON: It is hearsay.
>
> MR. GERLACH: The time for objection to exhibits is at the time of the pretrial statement.
>
> MR. PATTERSON: That is not true.
>
> He can ask what he did --
>
> THE COURT: Lay your predicate.

ORL1\LABOR\325242 1
21719/0021 AMG rw 5/30/00 8:08 AM

You are not offering it for the truth of the matter; is that what you said?

MR. GERLACH: I am not offering -- I don't understand the truth of the matter. [This seems to be an erroneous transcription.] I am certainly not offering it to validate the truth of the allegations that are made. I am offering it so the jury will see there was an actual letter in response to her complaint. We are not saying the allegations were substantiated.

MR. PATTERSON: He can testify about his investigation, that is why the witness is here.

THE COURT: How did your letters get in?

MR. PATTERSON: Your Honor to make me defend my evidence --

THE COURT: I am trying to understand the evidentiary difference between the letters that the plaintiff sent and the letters he sent.

MR. PATTERSON: Mr. Gerlach made an objection to Trina Rollie's letter.

THE COURT: That is a different basis.

MR. PATTERSON: What letter do I have to defend now --

THE COURT: You don't have to defend anything.

MR. GERLACH: This is a response to the letter from Davenport.

THE COURT: I will allow it in and overrule the objection. It is not coming in for the truth of the matter asserted. It is in response to her letter.

(Open court.)

The COURT: Overruled.

Excerpt of transcript p. 7 l. 4 through p. 8 l. 23. (emphasis added).

As can be readily seen, far from being "flustered" and needing "coaching" from the Court, the undersigned cogently provided the rationale for the Court's ruling prior to the Court's making it. Tr. 7, ll-14. The objection at page 12, also referred to in the Patterson affidavit, adds nothing.

Mr. Patterson's affidavit states at paragraph 5: "[T]he only evidentiary procedural mistake made by me in good faith turned into one of the most demeaning reprimands I have ever received in my life. Although the cold hard record reflects the reprimand, it does very little to illustrate the exchange as it truly transpired." First, as previously noted, far more than one such "evidentiary procedural mistake" occurred in the course of this lengthy trial. Second, the pages cited and attached to the service copy of the Patterson affidavit (15-21; 22 is missing) received by the undersigned, do not show any "reprimand" at all.

In Mr. Patterson's own affidavit and in that of his employer, Mr. Tobin--who attended only a small part of the proceedings during the early days of the Sharief trial--much is made of other alleged trials, other alleged experience, alleged accolades from other judges, the alleged fact that this is the first motion to rescuse, etc. In addition to their being completely irrelevant, these assertions have little force because Mr. Patterson had only been practicing law approximately two years at the time of the Sharief trial.

As stated in the Affidavit submitted herewith, the undersigned believes that, from its timing, the instant motion stems more from the Court's recent order setting trial in January 2002 than from any real belief that Plaintiff cannot get a fair trial from Judge Lenard. Plaintiff's counsel said nothing about a motion to disqualify[1] when both sides were in New York for depositions on April 20 and in fact had previously indicated satisfaction with the choice of the judge. Only after the Court's May 5 Orders regarding mediation and setting January 2002 as the trial date did Plaintiff file the instant motion.

Something quite similar happened in the Sharief case. At or about the time of the pretrial conference in February 1999, the Court (a) granted a significant portion of Defendant's Motion for Summary Judgment and (b) set the case for trial in early 2000. Plaintiff thereupon filed a motion to advance case on the trial docket--a motion not received by defense counsel--claiming that imminent financial disaster and bankruptcy would render Venator either unable to pay, or legally excused from paying, the enormous judgment that Ms. Sharief was inevitably going to receive. The Court granted the motion and set the case for trial in August 1999.

Although not completely unprecedented, what Plaintiff is attempting to accomplish--the disqualification of a district judge for what is said inside the courtroom during the trial (in another case, no less)--is, understandably, rare indeed. That the undersigned's objections were sustained more frequently than those of Plaintiff's counsel, even if true, is irrelevant. In-court rulings can never be the basis for rescual. See generally United States v. Grinnell Corp., 384 U.S. 563 (1966) (to be disqualifying, the alleged bias and prejudice of a judge must stem from an extra judicial source and result in an opinion on the merits on some basis other than what the

[1] Incidentally, this Motion does not comply with General Rule 7.1A.1., Rules of the United States District for the Southern District of Florida, in that it is not accompanied by a Memorandum of Law citing supporting authorities.

judge learned from participation in the case.) Furthermore, "[b]ias against a lawyer, even if found to exist, without more is not bias against a client." In re Drexel Burnham Lambert, Inc., 861 F. 2nd 1307, 1360 (2d Cir. 1988), quoted at Person v. General Motors Corp., 730 F. Supp. 516, 519 (W.D.N.Y. 1990).

As specified in the Affidavit submitted herewith, Judge Lenard was unusually accommodating to the litigants, jurors, court personnel and attorneys. Mr. Patterson certainly benefited from this accommodation, as did others. An unfortunate by-product of Judge Lenard's cooperative attitude, along with the usual 5-hour trial day, was that the Sharief trial probably lasted longer than it would have in almost any other courtroom. Debra Sharief got a fair trial; so did the defendants. Trina Rollie will get a fair trial in this case from Judge Lenard; so will the Defendant.

The instant motion puts the Court in the difficult position of having to analyze, evaluate and possibly defend its own motivation for what it did in during a long and hard-fought trial. Perhaps for this reason Southern District judges seem unusually fond of referring recusal motions to its chief judge. See United States v. Craig, 853 F. Supp. 1413 (S.D. Fla. 1994) (Roettger, C.J.) ("policy of this court for at least 20 years to refer such motions to the chief judge for consideration"); Lozano v. Maryland Cas. Co., 111 F. R. D. 455 (S.D. Fla. 1986) (King C.J.); Huff v. Standard Life Ins. Co., 643 F. Supp. 705 (S.D. Fla. 1986) (King, C.J.).

In any event, the motion to disqualify does not meet the exacting standard for disqualification of a judge under 28 U.S.C. §§ 144 and/or 455 and should be denied.

Respectfully submitted,

ALAN M. GERLACH, ESQ.
Florida Bar. No. 199184
BROAD AND CASSEL
390 North Orange Avenue, Suite 1100
Orlando, Florida 32801
P.O. Box 4961 (32802)
Telephone: (407) 839-4200
Fax: (407) 425-8377
Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to Kelsay D. Patterson, Esquire, MICHAEL M. TOBIN, P.A., 1099 Ponce de Leon Blvd., Coral Gables, Florida 33134, this 30th day of May, 2000.

ALAN M. GERLACH, ESQ.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TRINA ROLLIE,

Plaintiff,

v.

VENATOR GROUP RETAIL, INC., f/k/a KINNEY SHOE CORPORATION, a New York Corporation and VENATOR GROUP, INC., f/k/a WOOLWORTH CORPORATION, a New York Corporation,

Defendants.

/

CASE NO. 00-6119-CIV-LENARD
Magistrate Judge TURNOFF

**AFFIDAVIT**

STATE OF FLORIDA
COUNTY OF ORANGE

BEFORE ME, the undersigned Notary Public, personally appeared Alan M. Gerlach. who being by me first duly sworn according to law, deposes and says as follows:

1. I was lead counsel for the Defendant in the Debra Sharief v. Kinney Shoe Corp. and Woolworth Corp. trial alluded to in Plaintiff's Motion to Disqualify. Furthermore, I am lead counsel for the Defendant in the instant case. I make this Affidavit on personal knowledge except where otherwise indicated.

2. I was present for the entire Sharief trial, from August 25, 1999 through September 9, 1999. I was the only lawyer for the Defendants to attend and participate in the entire trial, just as Mr. Patterson was the only lawyer for the Plaintiff to do so.

3. Prior to the Sharief trial I had no knowledge of, conversation with, or meeting with District Judge Joan Lenard. In fact, the docket sounding in that case was the first time I ever saw Judge Lenard.

4. I have read the Plaintiff's Motion to Disqualify and the Affidavits submitted in connection therewith. I believe that any annoyance Judge Lenard felt towards Mr. Patterson resulted from errors made by counsel in the early phase of the case. Although my recollection of these matters is not perfect, the following come to mind:

(a) After accepting the jury, Mr. Patterson returned to counsel's table and then for the first time attempted to initiate a Batson challenge. The Judge agreed with the undersigned that he had already tendered the jury and had waived any objection but, in an abundance of caution, she required recitation of non-discriminatory reasons for Defendant's preemptory challenges to two black members of the panel.

(b) Plaintiff's opening statement was improper, and the undersigned was forced to object at certain points. A copy of the transcript of Mr. Patterson's opening remarks is attached hereto.

(c) Plaintiff's testimony was interrupted on Thursday, August 26, to allow for the testimony of Bernard Pettingill, Plaintiff's economic expert. It was stated that Pettingill had to testify on that particular day and at that particular time because he needed to be in Louisiana the next day to testify at a trial in federal district court in that state. Although there was nothing wrong in taking Pettingill's testimony out of order in this manner, Plaintiff's counsel did not really leave adequate time for the witness to be examined and cross-examined prior to the Court's normal announced recess time of 1:30 p.m. Further, Dr. Pettingill testified to three different backpay numbers (one in his deposition, one in his report, and one at the trial); when pressed during voir dire

ORL1\LABOR\325278.1
21719/0021 AMG rw 5/30/00 10:37 AM

on an exhibit, he had to admit that some of the assumptions he had made were inaccurate. In any event, the undersigned offered to stipulate to backpay in the amount of the lowest of three figures to which Pettingill had at one time testified and, after some resistance, Plaintiff's counsel agreed to accept the stipulation which resolved the issue on terms with which all parties could live. The Court may have appreciated the professionalism displayed in suggesting a resolution to an otherwise untenable situation.

        (d)      There was a problem with using Plaintiff's "blow-ups" of certain trial exhibits; although my memory of this issue is imperfect, I believe it had to do with the highlighting of portions of exhibits on the "blown-up" version which were not highlighted on the original. My recollection is the Court ruled that the blow-ups could be used as demonstrative aids for argument but not as exhibits because of whatever variance there was between the original and the "blown up" version.

        5.      Judge Lenard was extremely accommodating throughout the trial to counsel, parties, witnesses, and potential and actual members of the jury. In fact, her willingness to accommodate the schedules of other people resulted in the trial lasting longer than would have ordinarily been the case. For example, Mr. Patterson wanted to attend the wedding in London of a friend of his from Cleveland during the trial of the case and Judge Lenard actually agreed to a schedule that permitted him to do so. Mr. Patterson's version of a conversation with the Court involving meeting to discuss jury instructions is substantially correct (Patterson Affidavit, ¶ 2), although it does not include an account of the related issue of Mr. Patterson's wanting to attend the wedding in London. While the Court did seem to upbraid Mr. Patterson for some perceived selfishness, I attribute the Court's reaction to a misunderstanding of what it was Mr. Patterson was proposing and what the parties through counsel had agreed to arrange. A later, similar event occurred to me when the Judge

misunderstood a remark I made concerning the effect on the jury of having half-trial days and not holding trial on the Friday before, or the Tuesday after, the Labor Day weekend. The Court evidently thought that I was accusing it of only working half-days, which of course was not the case. I know from experience that this type of misunderstanding occurs in long, hard-fought trials, and I took it as such.

6.    I categorically deny ever stating that Judge Lenard had any antipathy to, or dislike for, Mr. Patterson. While I may have expressed confidence concerning a possible motion for summary judgment in this case, it had nothing to do with any perceived advantage in having Judge Lenard as the judge in this case; quite the contrary, as both counsel know, Judge Lenard granted only a portion of the motion for summary judgment in the Sharief case. The Sharief and Rollie cases are not identical, and there are defenses available to Venator in this case that were unavailable in the other, and vice-versa. It is true that in the first conversation I had with Mr. Patterson after service of the Rollie complaint, I did note with a chuckle that, despite his filing the case in the Ft. Lauderdale Division, the case had been assigned to Judge Lenard, with whom we had had the lengthy Sharief trial.

7.    On at least one occasion since filing the instant case, Mr. Patterson stated that he was "glad" that Judge Lenard had been assigned it because now he knew how to try a case in front of her. This conversation was before the court order scheduling the trial in January 2002. Because a somewhat similar series of events occurred in the Sharief case, as described in Defendant's Memorandum of Law in Response to Plaintiff's Motion to Disqualify, I personally believe that the prospect of having to wait nearly two years for a trial of this civil case is what really prompted the instant motion.

8. Personally, I believe that the assigned judge will be impartial to both sides if she remains on the case.

FURTHER AFFIANT SAYETH NOT.

Alan M. Gerlach

STATE OF FLORIDA
COUNTY OF ORANGE

The foregoing instrument was acknowledged before this 30th day of May, 2000 by Alan M. Gerlach. ~~He is~~ personally known to me or has produced ______________ as identification and did take an oath.

(Signature of Notary Public)

(Typed name of Notary Public)
Notary Public, State of Florida
Commission No. ______
My commission expires:

RUTH A. WARD
MY COMMISSION # CC 863008
EXPIRES: September 10, 2003
Bonded Thru Notary Public Underwriters

ORL1\LABOR\325278.1
21719/0021 AMG rw 5/30/00 10:37 AM

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to Kelsay D. Patterson, Esquire, MICHAEL M. TOBIN, P.A., 1099 Ponce de Leon Blvd., Coral Gables, Florida 33134, this 30th day of May, 2000.

ALAN M. GERLACH, ESQ.
Florida Bar. No. 199184
BROAD AND CASSEL
390 North Orange Avenue, Suite 1100
Orlando, Florida 32801
P.O. Box 4961 (32802)
Telephone: (407) 839-4200
Fax: (407) 425-8377
Attorneys for Defendant

***UNITED STATES DISTRICT COURT***
***SOUTHERN DISTRICT OF FLORIDA***
***MIAMI DIVISION***

**DEBRA SHARIEF,**

Case No. 97-1725-Civ-LENARD

Plaintiff,

vs.

**MIAMI, *FLORIDA***
AUGUST 26, 1999

**KINNEY SHOE CORPORATION,**
**a New York Corporation,**
**and WOOLWORTH CORPORATION,**

Defendants.

---

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE JOAN A. LENARD,**
**UNITED STATES DISTRICT JUDGE**

APPEARANCES:

FOR THE PLAINTIFF:

**KELSAY D. PATTERSON, ESQ.**
**JORGE RODRIGEUZ, ESQ.**
1099 Ponce de Leon Blvd.
Coral Gables, FL 331341

FOR THE DEFENDANT:

**BROAD AND CASSEL**
**BY: ALAN GERLACH, ESQ.**
390 North Orange Avenue
Suite 1100
Orlando, Florida 32801

REPORTED BY:

**JERALD M. MEYERS, RPR-CM**
Official Federal Court Reporter
301 North Miami Avenue, 9th Floor
Miami, FL 33128-7797 - 305/374-8108

**STENOGRAPHICALLY REPORTED COMPUTERIZED TRANSCRIPTION**

**[The jury returns to the courtroom].**

**THE COURT:** You may be seated. Again, I apologize to you for the delay. You may proceed.

**MR. PATTERSON:** Your Honor, are we free to walk around or at the podium?

**THE COURT:** Well, you need to be near a microphone, sir.

**MR. PATTERSON:** Okay. May it please the Court, counsel, members of the jury. Woolworth knew that one of their district managers respected nobody, and because their grievance department didn't care --

**MR. GERLACH:** Your Honor, I hate to interrupt counsel's opening statement, but may I approach the bench?

**THE COURT:** What is your objection?

**MR. GERLACH:** My objection is this is argument. This is not opening statement.

**MR. PATTERSON:** I can't say what we are going to prove if I can't get some of these words out.

**THE COURT:** Sustained.

**MR. PATTERSON:** Okay. We are here today to invoke the power of federal laws; laws passed by our U.S. Congress that prevent companies from applying a different set of terms, conditions and discipline.

**MR. GERLACH:** Your Honor, the same objection. As much as I hate no interrupt counsel's opening.

THE COURT: Counsel, direct your statement to what your evidence is going to show, sir.

MR. PATTERSON: The evidence will show that our federal laws prevent companies from applying a different set of terms, conditions and discipline to just their black employees.

You will see that these laws say that it is un-American to keep a promotion away from a black person when they have earned it, they deserve it and their performance justifies it.

We will show you that Kinney Shoe and Woolworth Corporation treated Debra Sharief very un-American. We make this promise to you, and after we have kept our promise to you, we will ask that you right a wrong.

As you are going to see, this case is like a puzzle. You are not going to see a smoking gun or a dead body, and have it over that fast; just as if you looked at one puzzle piece, you might not be able to figure out the whole story, but if you put them together and look at it, you will get a picture, and the picture is going to show what Kinney Shoe and what Woolworth Corporation did to Debra Sharief while she worked for them.

Obviously, there is a defendant here, and he has got lawyers. They have got lawyers, and it will be their job to try to stop you from seeing the full picture, to

throw in inaccurate puzzle pieces to stop you from seeing what we will try to prove to you.

**MR. ~~PATTERSON~~ GERLACH:** Your Honor, I object to the characterization of counsel; personal attack on counsel and to argument in plaintiff's opening statement.

**THE COURT:** Sustained.

**MR. PATTERSON:** We are going to show you the following things:

This case is not about affirmative action. It is not about quotas. It is not about special treatment to black people. It is not about welfare.

You will see this case is not about helping out people, giving them special treatment, special consideration.

We are going to show you that this case is about their rules, their policies, their procedures and their promises.

You will hear a promise that was made to all their employees, black, white, Hispanic, that each and every time a job promotion becomes available, it will always go to the best qualified, overall best person each and every time. They made that promise to all of their employees, including Debra Sharief.

Now we are going to show you through their documents, through their exhibits, through work they have

created and gave to Debra Sharief that shows that on August 6, 1996, Debra Sharief was passed over for the Dadeland Lady Foot Locker manager promotion.

We are going to show you that despite anything that they can say or do, this evidence will tell you the story. They gave it to her. We didn't manufacture it. We didn't create it. We are going to show it to you.

So whatever is said to belittle it, remember, they provided it. We are going to show you that they knew, that they knew had all the evidence that she was the best qualified, and they intentionally withheld the promotion only because she is black, and then they retaliated against her.

We are going to bring in two very nice people, Meredith Infeld and Antonio Fernandez; people who worked with Debra Sharief, friends of hers, managers, buddies, colleagues.

She called them and told them after she had the second audit that was bad in a row that she got a letter threatening the possibility of her termination. She thought her job was in jeopardy.

She calls Meredith and Tony, other managers, to find out have they ever received letters like this threatening their job termination because everybody knows that they have bad audits all the time, and Meredith and

Tony will come in here and tell you that when she made that phone call to them, that they all told her, "This is a surprise."

Sure, they had had bad audits, but never ever had they seen any letter like what she was talking about. When she complained about the different things going on in her direct because of her being black, they retaliated against her.

Surprise audits. You will see that they gave her low evaluation marks. You will see that they withheld a promotion. Another piece of the puzzle you will need to see is their grievance department; what they call their fair employment practice office.

You will see that she worked for a district manager who had a track record of violating everybody's rights, Hispanics, women, sexual harassment, race discrimination. A track record. And they left her in the same district and did nothing.

They turned their back on her. They would send him to the same sexual harassment class over and over and over and over and over again. You will see that that was the bottom line to all of their discipline each and every time.

You will see that Debra is suffering from clinical depression. You will see that everything she's

been through has caused her hair to fall out. You will hear from the psychologist, Doctor Efrain Gonzalez.

You will hear from Doctor Petingill, the economist who has talked to Debra and can tell you about how the pay differential being between being at her store in Westland and missing out on that promotion caused her to lose money and caused her to lose business opportunities.

Now, this is not a criminal case, so feel free to render the correct verdict because nobody is going to jail here. You will see that the laws require Debra to compare herself to the person who was promoted, Celia Gonzalez.

Now, you will see that Debra is not here to tear down Celia; to say anything negative about Celia. She thinks Celia is a nice person, but the law requires her to make this comparison to show that she was the best qualified in the whole district, and that's the only reason she's doing it.

She has sued Kinney Shoe and Woolworth Corporation. She has not sued Celia. No personal animosity whatsoever, and you will see that.

When you have heard everything, remember to come back to the two bottom lines; best overall qualified for the promotion, and retaliation. Remember, promotion and retaliation.

You will hear a lot of stuff. You will see a

lost of commercials, a lot of diversion, but come back to promotion and retaliation.

As we all know, people are not perfect. You will see that no case is perfect because cases are made up of people.

You will see that Debra will take responsibility for her attorneys; everything she's done in her life today because she's going to be on the stand in her case.

Look to them to see if they are going to take responsibility for anything. Look to them to see if they will take responsibility for leaving --

**MR. GERLACH:** Your Honor, I object to counsel's continued argument during opening statement.

**THE COURT:** Sustained.

**MR. GERLACH:** That was sustained; is that correct?

**THE COURT:** Sustained.

**MR. PATTERSON:** They will have a chance to talk to you. We are going to present the evidence in front of you. We are going to keep our promise.

We just have to meet the preponderance of the evidence first. That's just a little bit more than them. We are going to show you we are going to give you a lot more evidence than just a little bit more.

It comes down to remember, promotion and

retaliation. If you find Ms. Sharief on promotion or retaliation or both, then she's entitled to your verdict.

That's all we are here to prove to you today, is promotion and retaliation. Keep that in mind. No matter how much you hear, it comes back down to promotion and retaliation. Thank you.

**THE COURT**: You may proceed.

**MR. GERLACH**: Ladies and gentlemen of the jury, we met yesterday. My name is Alan Gerlach. I am from Orlando. I am with the a firm that's based in Miami, but I actually live in Orlando.

You were introduced to Mr. Willy Gugel, who is a regional vice-president for the defendant Lady Foot Locker and the paralegal, Marilyn Hobbs as well; Mr. Patterson.

The defendant takes the position that this is not a case of discrimination or of retaliation, but that the plaintiff is one who sees racial discrimination where it doesn't exist. She is one of those people.

The plaintiff was a competent store manager for Lady Foot Locker. She had her shortcomings, particularly in the area of audit and shrinkage control and in some other areas that you will hear about, but nobody contends that she was not a competent store manager for Lady Foot Locker.

She was successful as a store manager in the