MAR 0 7 2001

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

TRINA ROLLIE,                              CASE NO.: 00-6119-CIV-HUCK

      Plaintiff,                          Magistrate Judge Brown

v.

VENATOR GROUP RETAIL, INC. ,f/k/a
KINNEY SHOE CORPORATION,
a New York Corporation and
VENATOR GROUP, INC., f/k/a
WOOLWORTH CORPORATION,
a New York Corporation,

      Defendants.
_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE REGARDING DEBRA SHARIEF AND/OR OTHER ANECDOTAL EVIDENCE OF DISCRIMINATION AGAINST OTHER EMPLOYEES

      Plaintiff, TRINA ROLLIE, by and through undersigned counsel, hereby files the above entitled pleading and as grounds state as follows:

      1.     Plaintiff brings her race discrimination employment action under §1981 as said statute prohibits different and discriminatory terms and conditions of employment based upon race.

      2.     The Defendant would ask that the entire surrounding employment environment in which the Plaintiff worked, be excluded as circumstantial evidence of intentional discrimination because it would prove discriminatory motive. Debra Sharief, a witness for the Plaintiff's case, was formally employed by the Defendant. Ms. Sharief shares a great deal in common with the Plaintiff.



1

They both were discriminated against in the promotion process by the same
district manager, in the same exact district, by the same regional vice president,
in the same exact region, both are black, both were over qualified phenomenal
managers, neither of them were ever offered promotions to manage higher
volume stores, both received every notable award that could be awarded based
on **objective** criteria, both resigned, both were not allowed to travel for phase III
training, both were the district's only black managers, and both were subject to
the same employment conditions in the years 1992 through and until Sharief's
resignation in April of 1997.

   3.  The Defendant desires to cast the illusion that its treatment of the
Plaintiff was an anomaly. The Court should not allow a jury to be fooled by such
a false illusion, and the Plaintiff strongly suggests the Court defer to case law.

   In Troupe v. May Department Stores, 20 F.3d 734, 736 (7th Cir.
1994), a modern framework was developed by the Seventh Circuit that is
presently being relied upon by all of the circuits to assess circumstantial
evidence. The following is a complete quote of Chief Justice Posner's opinion Id.
at 736 (see attached Plaintiff's **Exhibit 1**).

> *Three (3) types of circumstantial evidence of intentional discrimination
> can be distinguished. The first consists of suspicious timing, ambiguous
> statements oral or written, behavior toward or comments directed at other
> employees in the protected group, and other bits and pieces from which an
> inference of discriminatory intent might be drawn. This is the most
> common type of evidence in an intentional discrimination case, now that
> employers have taught their supervisory employees not to put
> discriminatory beliefs or attitudes into words oral or written. Second is
> evidence, whether or not rigorously statistical, that employees similarly
> situated to the Plaintiff other than in the characteristic (pregnancy, sex,*

*race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. And third is evidence that the Plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination. Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the Plaintiff; or they can be used together.*

Since the amendment of the Civil Rights Act of 1991, Chief Justice Posner's opinion has been followed and published in employment discrimination law school textbooks as assigned reading as well as extensively followed in every circuit. Harold S. Lewis, Jr., Civil Rights and Employment Discrimination Law 226 (1997); Hasham v. California State Bd. of Equalization, 200F.3d 1035 (7th Cir. 2000); Fernandes v. Costa Bros. Masonry, Inc., 199 F. 3d 572 (1st Cir. 2000); Brown v. Sampson Resources Co., 2000 U.S. App. Lexis 22389, (10th Cir. 2000); Origel v. Community Action Servs., Case No.: 99C8180, U.S. Dist. Lexis 1540 (No. Dist of Ill Eastern Div. 2001); and Cross v. Southwest Recreational Industries, Inc., 17 Fed. Supp. 2d.1362 (No. Dist. of GA. 1998).

4.    In Carter v. Three Springs Residential Treatment, 132 F.3d 635, 645 (11th Cir. 1998), the Court held that it was improper for the District Court to have stricken several affidavits of other employees in the same protected class as the Plaintiff at the Summary Judgment phase because the related instances of "disparate treatment could be relevant to a trier of fact in evaluating Three Springs' motives". (See **Plaintiff's Exhibit 2**-the attached case).

5.      All but the very last case cited by the Defendant pre-dates the Amended Civil Rights Act of 1991. The last case is used by the Defendant for the proposition that a Plaintiff must first demonstrate that she has an action irrespective of the circumstantial evidence others can provide. The Defendant does not comment and has never asserted that the Plaintiff lacks a cognizable action. The Defendant acknowledges the legitimacy of the Plaintiff's action, and is seeking to eliminate and emaciate the most important and approved method of proving intentional discrimination through circumstantial evidence.

For the foregoing support, authority, and reasons, the Defendant's motion should be denied.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 7th day of March, 2001 to: Alan M. Gerlach, Esq., 390 N. Orange Avenue, Suite 1100, Orlando, Florida 32801.

MICHAEL M. TOBIN, P.A.
1099 Ponce de Leon Boulevard
Coral Gables, FL 33134-3319
Ph: 305/445-5475
Fax: 305/445-5479
BY: Kelsay D. Patterson
     Kelsay D. Patterson
     Florida Bar No. 119784

-4-

PAGE    18
20 F.3d 734 printed in FULL format.
Case 0:00-cv-06119-PCH    Document 65    Entered on FLSD Docket 03/08/2001    Page 5 of 22

KIMBERLY HERN TROUPE, Plaintiff-Appellant, v. THE MAY
DEPARTMENT STORES COMPANY, doing business as LORD & TAYLOR, Defendant-Appellee.

No. 93-2523

UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

20 F.3d 734; 1994 U.S. App. LEXIS 6030; 64 Fair Empl. Prac.
Cas. (BNA) 512; 64 Empl. Prac. Dec. (CCH) P42,920; 130 A.L.R. Fed. 763

February 18, 1994, Argued   March 31, 1994, Decided

PRIOR HISTORY:  Appeal from the United States District Court for the Northern
District of Illinois, Eastern Division. No. 92 C 2605. John F. Grady, Judge.

DISPOSITION: AFFIRMED.

CORE TERMS:  pregnancy, fired, maternity, morning sickness, Pregnancy
Discrimination Act, tardiness, warning, intentional discrimination,
circumstantial evidence, direct evidence, pregnant women, nonpregnant, timing,
tardy, discriminatory intent, pretext, sex, probationary period, return to work,
sick leave, comparable, rational trier of fact, theory of liability, employment
contract, similarly situated, present evidence, disparate impact, summary
judgment, type of evidence, per curiam

COUNSEL: For KIMBERLY HERN TROUPE, Plaintiff-Appellant: Ernest T. Rossiello,
Margaret A. Zuleger, ROSSIELLO & ASSOCIATES, Chicago, IL.

For MAY DEPARTMENT STORES COMPANY, dba Lord & Taylor, Defendant-Appellee:
William M. Walsh, SONNENSCHEIN, NATH & ROSENTHAL, Chicago, IL. Ronald J. Dolan,
Lori Kay Cochran, Betty L. Thorns, MAY DEPARTMENT STORES, St. Louis, MO.

JUDGES: Before POSNER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

OPINIONBY: POSNER

OPINION: [*735] POSNER, Chief Judge. In 1978, Congress amended Title VII of
the Civil Rights Act of 1964 to prohibit discrimination on account of pregnancy:
"women affected by pregnancy, childbirth, or related medical conditions shall be
treated the same for all employment-related purposes, including receipt of
benefits under fringe benefit programs, as other persons not so affected but
similar in their ability or inability to work." 42 U.S.C. @ 2000e(k). The
Supreme Court had held in the Gilbert case that discrimination on account of sex
did not include discrimination on account of pregnancy,  so employers were free
to exclude medical expenses relating to pregnancy and childbirth from their
medical-benefits plans. General Electric Co. v. Gilbert, 429 U.S. 125, 50 L.


PLAINTIFF'S
EXHIBIT

1

Ed. 2d 343, 97 S. Ct. 401 (1976). The pregnancy-discrimination amendment overruled Gilbert, see Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 678, 77 L. Ed. 2d 89, 103 S. Ct. 2622 (1983), but, as the text we have quoted makes clear, goes further. See, e.g., International Union, United Automobile Workers v. Johnson Controls, Inc., 499 U.S. 187, 198-99, 113 L. Ed. 2d 158, 111 S. Ct. 1196 (1991). How much further is the issue in this case.

    The plaintiff, Kimberly Hern Troupe, was employed by the Lord & Taylor department store in Chicago as a saleswoman in the women's accessories department. She had begun working there in 1987, initially working part time but from July 1990 full time. Until the end of 1990 her work was entirely satisfactory. In December of that year, in the first trimester of a pregnancy, she began experiencing morning sickness of unusual severity. The following month she requested and was granted a return to part-time status, working from noon to 5:00 p.m. Partly it seems because she slept later under the new schedule, so that noon was "morning" for her, she continued to experience severe morning sickness at work, causing what her lawyer describes with understatement as "slight" or "occasional" tardiness. In the month that ended with a warning from her immediate supervisor, Jennifer Rauch, on February 18, she reported late to work, or left early, on nine out of the 21 working days. The day after the warning she was late again and this time received a written warning. After she was tardy three days in a row late in March, the company on March 29 placed her on probation for 60 days. During the probationary period Troupe was late eleven more days; and she was fired on June 7, shortly after the end of the probationary period. She testified at her deposition that on the way to the meeting with the defendant's human resources manager at which [*736] she was fired, Rauch told her that "I [Troupe] was going to be terminated because she [Rauch] didn't think I was coming back to work after I had my baby." Troupe was due to begin her maternity leave the next day. We do not know whether it was to be a paid maternity leave but at argument Lord & Taylor's counsel said that employees of Lord & Taylor are entitled to maternity leave with half pay. We must assume that after Troupe was fired she received no medical benefits from Lord & Taylor in connection with her pregnancy and the birth of her child; for she testified without contradiction that she received no monetary benefits of any kind, other than unemployment benefits, after June 7, 1991. We do not know whether Lord & Taylor was less tolerant of Troupe's tardiness than it would have been had the cause not been a medical condition related to pregnancy. There is no evidence on this question, vital as it is.

    In granting Lord & Taylor's motion for summary judgment, the district judge said that there is a "direct" and an "indirect" method of proving pregnancy discrimination, that the plaintiff used the direct method, that that method requires "direct evidence" of discrimination, meaning evidence that proves discrimination "without the need for inference or presumption," and that Troupe failed to produce any such evidence. Although language in some of our opinions, such as Aungst v. Westinghouse Electric Corp., 937 F.2d 1216, 1221 (7th Cir. 1991), and McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 372 (7th Cir. 1992), could be read to support this way of framing and resolving the issue, we acknowledge the potential for confusion and will take this opportunity to try to clarify the circuit's position.

    Different kinds and combinations of evidence can create a triable issue of intentional discrimination ("disparate treatment," in the jargon of discrimination law), the only kind of discrimination alleged in this case. One

kind is evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents, as in Mojica v. Gannett Co., 7 F.3d 552, 561 (7th Cir. 1993) (en banc). Such evidence is indeed direct evidence as distinct from circumstantial; and since intent to discriminate is a mental state and mind reading not an accepted tool of judicial inquiry, it may be the only truly direct evidence of intent that will ever be available. But circumstantial evidence is admissible too, to provide a basis for drawing an inference of intentional discrimination.

   Three types of circumstantial evidence of intentional discrimination can be distinguished. The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. Giacoletto v. Amax Zinc Co., 954 F.2d 424 (7th Cir. 1992); Holland v. Jefferson National Life Ins. Co., 883 F.2d 1307, 1314-15 (7th Cir. 1989). This is the most common type of evidence in an intentional discrimination case, now that employers have taught their supervisory employees not to put discriminatory beliefs or attitudes into words oral or written. Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. American Nurses' Ass'n v. Illinois, 783 F.2d 716, 728 (7th Cir. 1986). And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination. St. Mary's Honor Center v. Hicks, 125 L. Ed. 2d 407, 113 S. Ct. 2742, 2749 (1993); Ayala v. Mayfair Molded Products Corp., 831 F.2d 1314, 1318 (7th Cir. 1987). Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together.

   The plaintiff in this case did not present any circumstantial evidence of the second or third type--that is, either comparative or pretext. She presented no evidence about the treatment of other employees; and because [*737] of her tardiness she could not show that she met the employer's requirements for her job, and thus she could not raise an issue of pretext. So, the defendant argues, the plaintiff was required to present evidence that the defendant had acknowledged that it discriminates against pregnant women. This is wrong. It merges what we called direct evidence of discriminatory intent with the first kind of circumstantial evidence, the kind that consists of ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff. For it is not true that to get over the hurdle of summary judgment a plaintiff must produce the equivalent of an admission of guilt by the defendant. All that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class, in this case the class of pregnant women. Visser v. Packer Engineering Associates, Inc., 924 F.2d 655, 658 (7th Cir. 1991) (en banc); cf. Perfetti v. First National Bank, 950 F.2d 449, 450 (7th Cir. 1991); Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1364 (7th Cir. 1988); but cf. Hughes v. Matthews, 986 F.2d 1168, 1170 (8th Cir. 1992) (per curiam).

We must examine the record in the light of these principles. The great, the
undeniable fact is the plaintiff's tardiness. Her lawyer argues with great vigor
that she should not be blamed--that she was genuinely ill, had a doctor's
excuse, etc. That would be pertinent if Troupe were arguing that the Pregnancy
Discrimination Act requires an employer to treat an employee afflicted by
morning sickness better than the employer would treat an employee who was
equally tardy for some other health reason. This is rightly not argued. If an
employee who (like Troupe) does not have an employment contract cannot work
because of illness, nothing in Title VII requires the employer to keep the
employee on the payroll. Bush v. Commonwealth Edison Co., 990 F.2d 928, 931 (7th
Cir. 1993); Rush v. McDonald's Corp., 966 F.2d 1104, 1107, 1115 (7th Cir. 1992).

     Against the inference that Troupe was fired because she was chronically late
to arrive at work and chronically early to leave, she has only two facts to
offer. The first is the timing of her discharge: she was fired the day before
her maternity leave was to begin. Her morning sickness could not interfere with
her work when she was not working because she was on maternity leave, and it
could not interfere with her work when she returned to work after her maternity
leave because her morning sickness would end at the latest with the birth of her
child. Thus her employer fired her one day before the problem that the employer
says caused her to be fired was certain to end. If the discharge of an
unsatisfactory worker were a purely remedial measure rather than also, or
instead, a deterrent one, the inference that Troupe wasn't really fired because
of her tardiness would therefore be a powerful one. But that is a big "if." We
must remember that after two warnings Troupe had been placed on probation for
sixty days and that she had violated the implicit terms of probation by being as
tardy during the probationary period as she had been before. If the company did
not fire her, its warnings and threats would seem empty. Employees would be
encouraged to flout work rules knowing that the only sanction would be a
toothless warning or a meaningless period of probation.

     Yet this is only an interpretation; and it might appear to be an issue for
trial whether it is superior to Troupe's interpretation. But what is Troupe's
interpretation? Not (as we understand it) that Lord & Taylor wanted to get back
at her for becoming pregnant or having morning sickness. The only significance
she asks us to attach to the timing of her discharge is as reinforcement for the
inference that she asks us to draw from Rauch's statement about the reason for
her termination: that she was terminated because her employer did not expect her
to return to work after her maternity leave was up. We must decide whether a
termination so motivated is discrimination within the meaning of the pregnancy
amendment to Title VII.

     [*738] Standing alone, it is not. (It could be a breach of contract, but
that is not alleged.) Suppose that Lord & Taylor had an employee named Jones, a
black employee scheduled to take a three-month paid sick leave for a kidney
transplant; and whether thinking that he would not return to work when his leave
was up or not wanting to incur the expense of paying him while he was on sick
leave, the company fired him. In doing so it might be breaking its employment
contract with Jones, if it had one, or violating a state statute requiring the
payment of earned wages. But the company could not be found guilty of racial
discrimination unless (in the absence of any of the other types of evidence of
discrimination that we have discussed) there was evidence that it failed to

PAGE 22

Case 0:00-cv-06118-PCH Document 65 Entered on FLSD Docket 03/08/2001 Page 9 of 22

20 F.3d 734, *; 1994 U.S. App. LEXIS 6039; 64 Fair Empl. Prac. Cas. (BNA) 512; 64 Empl. Prac. Dec. (CCH) P42,920

exhibit comparable rapacity toward similarly situated employees of the white race. We must imagine a hypothetical Mr. Troupe, who is as tardy as Ms. Troupe was, also because of health problems, and who is about to take a protracted sick leave growing out of those problems at an expense to Lord & Taylor equal to that of Ms. Troupe's maternity leave. If Lord & Taylor would have fired our hypothetical Mr. Troupe, this implies that it fired Ms. Troupe not because she was pregnant but because she cost the company more than she was worth to it.

The Pregnancy Discrimination Act does not, despite the urgings of feminist scholars, e.g., Herma Hill Kay, "Equality and Difference: The Case of Pregnancy," 1 Berkeley Women's L.J. 1, 30-31 (1985), require employers to offer maternity leave or take other steps to make it easier for pregnant women to work, cf. California Federal Savings & Loan Ass'n v. Guerra, 479 U.S. 272, 286-87, 93 L. Ed. 2d 613, 107 S. Ct. 683 (1987); Barrash v. Bowen, 846 F.2d 927 (4th Cir. 1988) (per curiam); 29 C.F.R. @ 1604.10(b) and App. to Pt. 604 (EEOC Guidelines on Discrimination Because of Sex: Questions and Answers on the Pregnancy Discrimination Act)--to make it as easy, say, as it is for their spouses to continue working during pregnancy. Employers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees, even to the point of "conditioning the availability of an employment benefit on an employee's decision to return to work after the end of the medical disability that pregnancy causes." Maganuco v. Leyden Community High School Dist. 212, 939 F.2d 440, 445 (7th Cir. 1991). Maganuco and other cases hold that disparate impact is a permissible theory of liability under the Pregnancy Discrimination Act, as it is under other provisions of Title VII. Id. at 443. But, properly understood, disparate impact as a theory of liability is a means of dealing with the residues of past discrimination, rather than a warrant for favoritism. Finnegan v. Trans World Airlines, Inc., 967 F.2d 1161, 1164 (7th Cir. 1992).

The plaintiff has made no effort to show that if all the pertinent facts were as they are except for the fact of her pregnancy, she would not have been fired. So in the end she has no evidence from which a rational trier of fact could infer that she was a victim of pregnancy discrimination. The Supreme Court noted recently that the age discrimination "law requires the employer to ignore an employee's age . . . ; it does not specify further characteristics that an employer must also ignore," such as pension expense. Hazen Paper Co. v. Biggins, 123 L. Ed. 2d 338, 113 S. Ct. 1701, 1707 (1993) (emphasis in original). The Pregnancy Discrimination Act requires the employer to ignore an employee's pregnancy, but (as the quotation from Maganuco shows) not her absence from work, unless the employer overlooks the comparable absences of nonpregnant employees, 29 C.F.R. App., supra; cf. Adams v. Nolan, 962 F.2d 791, 795-96 (8th Cir. 1992)--in which event it would not be ignoring pregnancy after all. Nashville Gas Co. v. Satty, 434 U.S. 136, 138-43, 54 L. Ed. 2d 356, 98 S. Ct. 347 (1977); Fleming v. Ayers & Associates, 948 F.2d 993, 997 (6th Cir. 1991). Of course there may be no comparable absences, cf. Barrash v. Bowen, supra, 846 F.2d at 931-32; but we do not understand Troupe to be arguing that she did not present evidence that nonpregnant employees were treated more favorably than she is that (in contrast to EEOC v. Ackerman, Hood & McQueen, Inc., 956 F.2d 944 (10th Cir. 1992)) there is no comparison group of Lord & Taylor employees. [*739]What to do in such a case is an issue for a case in which the issue is raised. (We do not even know how long Troupe's maternity leave was supposed to be.) We doubt that finding a comparison group would be that difficult. Troupe would be halfway home if she could find one nonpregnant employee of Lord & Taylor who had not been fired when about to begin a leave similar in length to

Case 0:00-cv-06119-PCH   Document 63   Entered on FLSD Docket 03/08/2001   Page 10 of 22

28 F.3d 734, *; 1994 U.S. App. LEXIS 6030;
64 Fair Empl. Prac. Cas. (BNA) 512; 64 Empl. Prac. Dec. (CCH) P42,920

hers. She either did not look, or did not find. Given the absence of other
evidence, her failure to present any comparison evidence doomed her case.

AFFIRMED.

Charles L. CARTER, Plaintiff-Appellant, v. THREE SPRINGS
RESIDENTIAL TREATMENT, Defendant-Appellee.

No. 97-6256.

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

132 F.3d 635; 1998 U.S. App. LEXIS 81; 76 Fair Empl. Prac.
Cas. (BNA) 1635; 72 Empl. Prac. Dec. (CCH) P45,148; 11 Fla. L. Weekly Fed. C 925

January 6, 1998, Decided

PRIOR HISTORY: [**1] Appeal from the United States District Court for the
Northern District of Alabama. (No. CV 95-HM-2325-NW). E. B. Haltom, Jr., Judge.

DISPOSITION: REVERSED and REMANDED.

CORE TERMS: promotion, counselor, clinical, summary judgment, direct evidence,
circumstantial evidence, job description, supervisor, skills, vacancy, racial
discrimination, educational, hired, administrator, deposition, disparate
treatment, prima facie case, qualification, struck, special knowledge, bias,
reasonable trier of fact, favorable, internally, supervise, announced,
personnel, promoted, vacant, personal knowledge

COUNSEL: FOR APPELLANT(S): John R. Benn, Sheffield, AL.

FOR APPELLEE(S): David J. Middlebrooks, Christopher S. Enloe, Terry Price, Brent
L. Crumpton, Birmingham, AL.

JUDGES: Before HATCHETT, Chief Judge, and FAY and FARRIS, * Senior Circuit
Judges.

* Honorable Jerome Farris, Senior U.S. Circuit Judge for the Ninth Circuit,
sitting by designation.

OPINIONBY: FAY

OPINION: [*637] FAY, Senior Circuit Judge:

   Plaintiff-Appellant Charles L. Carter, a black male, brought this Title VII
action against his employer, Defendant-Appellee Three Springs Residential
Treatment ("Three Springs"), alleging that Three Springs' decision to promote
Greg Haynes, a white male, to the position of Program Director at its Courtland,
Alabama facility was motivated by unlawful racial discrimination. After the

PLAINTIFF'S
EXHIBIT
2

PAGE    3

Case 0:00-cv-06151-PCH   Document 62   Entered on FLSD Docket 03/08/2001   Page 12 of 22

122 F.3d 635 *; 1998 U.S. App. LEXIS 81 **;
76 Fair Empl. Prac. Cas. (BNA) 1633; 72 Empl. Prac. Dec. (CCH) P45,148

close of discovery, the district court entered summary judgment for Three
 Springs, finding that Carter failed to produce either direct evidence of
racial discrimination, or circumstantial evidence in satisfaction of the
elements of a prima facie case of disparate treatment as set out in McDonnell
Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).
[**2]Because we find that the evidence in this record, when viewed in the
light most favorable to Carter, satisfies the McDonnell Douglas elements and
could be found to cast doubt on the legitimacy of Three Springs' reasons for
not promoting Carter, we reverse the entry of summary judgment and remand for
trial.

    I. FACTS

    A. Background

    Three Springs' facility in Courtland, Alabama (the "Courtland facility"),
which opened in 1990, specializes in the treatment of young males with histories
of sexual crimes or other serious mental health problems. The population of the
Courtland facility tends to be very aggressive, consisting of children and young
adults who can be sociopathic in nature and have great difficulty telling right
from wrong. The Courtland facility addresses these problems through psychotropic
medicine, psychological counseling, and educational services.

    To deliver this care, the Courtland facility has a large staff, much of which
is under the supervision of the facility's Program Director. According to the
published job description, the Program Director "is responsible for the sound
management and effective [*638] service of all clinical departments. This
position coordinates[**3] the clinical services of the facility to maximize
effectiveness and eliminate duplication of effort." The departments supervised
by the Program Director include Family Services, Educational Services,
Admissions, Administration, and Nursing. The Assistant Director of Nursing
supervises the various categories of Counselors at the facility, including the
positions occupied by Carter during his tenure as a Three Springs employee.
The Program Director's direct supervisor is the facility's Administrator. At the
time that Carter was considered for promotion to the position of Program
Director, the Administrator was Dr. Pam Cook. It is uncontested that the
decision not to promote Carter was made by Cook and her immediate supervisor,
Beverly McLemore, Three Springs' Director of Operations.

    Carter applied for a position at the Courtland facility in September 1990
at the age of 57. He had retired about a year earlier from a long career as an
educator in Alabama public schools. In 1956, Carter had his first job as a coach
and teacher at Cherokee High School in Colbert County, Alabama. After just four
years, he was hired to be principal of the Webster School in Muscle Shoals,
Alabama. In 1967, [**4] the Webster School was closed and turned into a Head
Start Center, a pre-school for underprivileged children. Carter stayed on as a
teacher until 1971.

    In 1971, Carter was hired as a physical education teacher at Avalon Middle
School and Muscle Shoals High School. In 1972 he became principal of Avalon
Middle School, in part by order of the old Fifth Circuit. n1 The school board
fired Carter for insubordination in 1977. He sued and was denied relief in an
order affirmed by this court. n2 After a brief hiatus, he was hired by his alma
mater, Alabama State University, to teach education administration in the

graduate school of education. In 1978, he left the university to become a
project director for the National Employment Service, a program funded by the
Department of Labor and charged with helping the unemployed find work. After the
program lost its funding, Carter worked briefly for an attorney helping him to
prepare racial discrimination lawsuits. In 1982, he returned to public education
as principal of Bullock County High School. After six years on the job, he
retired in 1988.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

   n1 The Webster School was closed as a result of a desegregation order. Carter
argued, and the Fifth Circuit agreed, that the school district was obliged to
fill administrative positions in new schools with displaced administrators from
the closed schools. See Lee v. Macon County Bd. of Educ., 453 F.2d 1104 (5th
Cir.1971).
[**5]

   n2 Carter v. Muscle Shoals Bd. of Educ., 669 F.2d 735 (11th Cir. 1982).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

   In addition to his job experience, Carter also boasted a bachelor's degree
from Alabama State University in Physical Education and History received in
1956, and a master's degree from Indiana University in Educational
Administration-Guidance received in 1966. He continued to take courses in the
field of educational administration at the University of Alabama until 1978.

   Carter was hired to be a Counselor Aide at the Courtland facility after
interviewing with McLemore in September 1990. Carter testified in his deposition
that, as a Counselor Aide, his job was to man a post and check in with his
supervisor for the assignment of various tasks. These tasks included talking
with students, going for walks with them, playing sports with them, and
"counseling with them." Carter described these counseling sessions: "Well, some
children come from Georgia or someplace, and they needed a--just to talk. They
needed to tell you about their problems. And you just mainly--sometimes you'd
just listen. And if they asked you a question, [**6] you'd try to help him
solve it." Carter testified that he would report his conversations with students
to psychiatrists and social workers.

   Carter served as Counselor Aide until January 1991 when he was promoted by
McLemore and Cook to the position of Counselor I. Carter testified that he asked
Cook and McLemore for the promotion and received it after "somebody got fired or
quit." Carter described his responsibilities as Counselor I:

   My job duties as a counselor was to again do the one-to-one counseling, teach
counselors--teach Life Skills at night one day a week--or two days a week, two
days a [*639] week, and supervise the group when I go to lunch, supervise
them on the playground, supervise them in the hall, and in the mornings, wake
them up, see to it that everybody took a bath and get ready for breakfast at
6:00, and whatever I was told--whatever else I was told to do.

PAGE    5

Case 0:00-cv-06119-PCH   Document 91   Entered on FLSD Docket 03/08/2001   Page 14 of 22
132 F.3d 525, *; 1998 U.S. App. LEXIS 81, **;
76 Fair Empl. Prac. Cas. (BNA) 1695; 72 Empl. Prac. Dec. (CCH) P45,148

Three Springs' official job description for the position of Counselor I was,
"Provides direct service delivery to resident population and assures quality
documentation in resident medical report."

In September of 1992, Carter was made a shift supervisor by Cook with
supervisory responsibility over other counselors. [**7] Although he was
considered for vacancies in the position of Program Director in late 1992 and
early 1993, he was not promoted. In May of 1993 Carter was again promoted to the
position of Counselor II. The job description for the position of Counselor II
is identical to that of Counselor I. Later, in 1993, he was again considered for
the position of Program Director, but the position never became vacant.

In general, Carter's performance as a Counselor received high marks from his
supervisors, and the general quality of his work as a counselor is not disputed
by Three Springs. He received one oral reprimand for his involvement in an
incident where two residents escaped from the facility. On another occasion he
was informed that he needed to improve the quality of his written reports.

B. The Employment Decisions at Issue

The controversy in this case revolves around Three Springs' efforts, once in
1992 and twice in 1993, to fill the position of Program Director. Carter
testified in deposition that as early as 1990 he made his interest in the
position clear to Cook and McLemore, and they do not dispute that he was
considered for the promotion on at least three different occasions. [**8]

Three Springs had written policies that pertain to the process of filling the
position. First, Three Springs had the policy that "all open positions will be
announced internally by posting the position on the staff bulletin board in
order for employees to be aware of, and apply for, positions for which they are
qualified." Second, "if more than one staff member qualifies for the same
position, the promotion decision will be based upon (in this order): 1) job
performance in existing role; 2) seniority within the job classification; 3)
seniority within the organization." Last, Three Springs had a written job
description for the position of Program Director that included a list of the
"position requirements":

EDUCATION: Master's degree from an accredited college or university in mental
health-related clinical field, or administrative field, or Ph.D. in clinical or
administrative area.

EXPERIENCE: Three to five years of clinical experience with prior
administrative experience in a psychiatric in-patient setting. Licensure or
certification by appropriate state body if applicable to educational degree.
Prior experience in facility which meets JCAHO and Medicare standards desired.
[**9]
SPECIAL KNOWLEDGE AND SKILLS: 1) Exceptional verbal and written skills are
required to effectively express ideas and views when (a) speaking to groups,
medical staff, clinical personnel, and administrator; (b) for preparing written
reports in technical language; for (c) clarify [sic] in supervising and
delegating responsibility to department heads. 2) Ability to evaluate and
utilize data from statistical reports, budgets, descriptions of programs. 3)
Must possess initiative and judgement capabilities to organize and plan
activities, formulate policies, delegate responsibility, to organize and plan

PAGE     6

Case 0:00-cv-06119-PCH   Document 62   Entered on FLSD Docket 03/08/2001   Page 15 of 22

132 F.3d 535, *; 1998 U.S. App. LEXIS 81, **;
76 Fair Empl. Prac. Cas. (BNA) 1653; 72 Empl. Prac. Dec. (CCH) P45,049

activities, formulate policies, delegate responsibility [sic], systematize
procedures, promote favorable public relations and make decisions affecting
service delivery to patients. 4) Must be capable of relating to people in a
manner to win confidence and establish support. Must be flexible to adjust to
changing conditions and the various details of the job.

The first vacancy arose in November 1992 when Cook was promoted from the
position of Program Director to become the facility's Administrator. The record
is not clear as to [*640] whether the vacancy was announced internally as
required[**10] by Three Springs' policy. n3 Cook and McLemore testified in
deposition that, at that time, they individually compiled "mental lists" of
employees involved in direct patient care who met the educational requirement
for the position. According to the official job description, the position
required a "Master's degree from an accredited college or university in mental
health-related clinical field, or Ph.D. in clinical or administrative area."

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n3 Cook and McLemore testified in deposition that they did not remember
posting the vacancy, but Carter testified that he thought he remembered seeing
an announcement.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Cook and McLemore testified that they individually reviewed the personnel
files of all direct care employees who met the education requirement, a list
that included Carter and Brenda Baird, then the Director of Family Services, and
Greg Haynes, then the Director of Educational Services. They testified that they
reviewed each file without consideration of the employee's demonstrated interest
in the position. After[**11] reviewing the files, they both determined that
Baird, a white female, was the most qualified individual. Cook then informally
interviewed Baird and gave her the promotion. n4

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4 Carter does not allege that the selection of Baird constituted
discrimination because he concedes that Baird was more qualified for the
promotion

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Baird stayed in the position for a very short time, and the position was
again vacant in early 1993. Cook and McLemore failed to comply with company
policy and did not internally announce the vacancy. They again reviewed the
personnel files of all employees with the appropriate educational credentials,
including Carter and Haynes. Haynes, a white male and then the Director of
Education, joined the Courtland facility in August 1992. Before that, he worked
at the C.I.T.Y. program in Tuscaloosa, Alabama, a program designed to intervene
in the lives of juvenile criminals. At the Courtland facility, he assisted in
the treatment of adolescent sexual disorders and helped the facility to meet

PAGE    7

Case 0:00-cv-06151-PCH   Document 84   Entered on FLSD Docket 03/08/2001   Page 16 of 22
132 F.3d 635 *; 1998 U.S. App. LEXIS 81 **;
76 Fair Empl. Prac. Cas. (BNA) 1695; 72 Empl. Prac. Dec. (CCH) P45,148

various[**12] federal and state standards.

    Cook stated in her affidavit that she and McLemore reviewed the personnel
files of people who met the education requirement to determine if they met the
other job requirements of experience, and special knowledge and skills.
According to McLemore and Cook, neither Haynes nor Carter met the experience
requirement. Nonetheless, they agreed that Haynes was the most qualified person
for the job, informally interviewed him, and hired him. The entire process took
two days.

    Later in 1993, Haynes announced that he intended to transfer to a different
Three Springs facility. This time, Cook and McLemore posted an announcement of
the expected vacancy both internally and externally. In response, they received
applications from two internal applicants including Carter. Cook and McLemore
interviewed Carter. McLemore stated that she was not impressed with Carter's
interview. In any event, Haynes decided not to leave the Courtland facility, and
the position never became vacant.

C. Procedural History

    Carter filed this action on September 11, 1995, alleging violations of both
the Age Discrimination in Employment Act, 29 U.S.C. @ 6001, and Title VII of the
Civil[**13] Rights Act of 1964, 42 U.S.C. @ 2000e. Carter subsequently
dropped his age discrimination claim. After the close of discovery,  Three
 Springs  moved for summary judgment.

     Carter's  theory of liability under Title VII was that the decision to
promote Haynes to fill the second vacancy of the position of Program Director
was motivated by the desire to promote a white employee instead of a black
employee. In support of this theory, Carter offered affidavits containing
statements by Cook, allegedly constituting direct evidence of  Three Springs'
discrimination. In support of his circumstantial evidence theory,  Carter
argued to the district court that the evidence in the summary judgment record
indicated that he was qualified for the promotion and that Haynes was not better
qualified. Furthermore,  Carter  argued that  Three Springs'  failure to adhere
to its own policies with regard to filling vacant positions [*641]
contributed to a possible inference of discrimination. Finally, Carter submitted
ten affidavits of black former employees of the Courtland facility who recounted
instances of disparate treatment while on the job as circumstantial evidence
that he was passed over for promotion because of[**14] his race.

    The district court struck most of the content of the affidavits submitted by
Carter from the summary judgment record on various grounds such as relevance,
inadmissable hearsay, and lack of personal knowledge. On February 12, 1997, the
district court entered summary judgment for Three Springs. The district court
found that no inference of discrimination could arise from the facts in the
summary judgment record because Carter had not shown that he was qualified to be
Program Director. Carter filed notice of appeal on March 14, 1997, and we have
jurisdiction pursuant to 28 U.S.C. @ 1291.

II. STANDARD OF REVIEW

    We review the granting of a motion for summary judgment de novo, using the
same legal standard as the district court. See Mayfield v. Patterson Pump Co.,

PAGE    8

132 F.3d 635, *; 1998 U.S. App. LEXIS 81, **

76 Fair Empl. Prac. Cas. (BNA) 1695; 72 Empl. Prac. Dec. (CCH) P45,146

Case 0:00-cv-06161-JIC   Document 85   Entered on FLSD Docket 03/08/2001   Page 17 of 22

101 F.3d 1371, 1374 (11th Cir.1996). Summary judgment is proper if the
pleadings, depositions, and affidavits show that there is no genuine issue of
material fact and that the moving party is entitled to judgment as a matter of
law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91
L. Ed. 2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). In reviewing the record, we
are mindful that the[**15] evidence must be viewed in the light most
favorable to the nonmoving party. See Augusta Iron & Steel Works, Inc. v.
Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir.1988).

III. DISCUSSION

    The issue in this case is whether Carter carried his burden of producing
evidence sufficient to create a genuine issue as to a material fact on his
disparate treatment claim. A plaintiff can carry this burden by producing direct
evidence of discrimination motivating the employment decision at issue, or by
producing circumstantial evidence sufficient to allow an inference of
discrimination. See Lee v. Russell County Bd. of Educ., 684 F.2d 769, 773-74
(11th Cir.1982). Whether evidence is characterized as "direct" or
"circumstantial" dramatically affects the allocation of the evidentiary burdens;
therefore, we discuss the two types of evidence separately to determine whether
summary judgment was appropriate.

    A. Direct Evidence

    Carter argues that the trial court erred in granting summary judgment because
he presented direct evidence that  Three Springs  failed to promote him because
of his race. If  Carter  is right, then summary judgment was inappropriate and
the burden of persuasion[**16] at trial should have shifted to Three Springs
to prove by a preponderance of the evidence that it would have made the same
decision even if it had not used race as a criteria in its decision to promote
Haynes instead of Carter. See Price Waterhouse v. Hopkins, 490 U.S. 228, 276-77,
109 S. Ct. 1775, 1804-05, 104 L. Ed. 2d 268 (1989) (O'Connor, J., concurring);
Haynes v. W.C. Caye & Co., Inc., 52 F.3d 928, 931 n. 8 (11th Cir.1995) (adopting
Justice O'Connor's burden of proof analysis).

    We have defined direct evidence as " "evidence, which if believed, proves
existence of fact in issue without inference or presumption.' " Merritt v.
Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir.1997), quoting Rollins v.
TechSouth Inc., 833 F.2d 1525, 1528 n. 6 (11th Cir.1987). "Direct evidence
relates to actions or statements of an employer reflecting a discriminatory or
retaliatory attitude correlating to the discrimination or retaliation complained
of by the employee." Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th
Cir.1990). See, e.g., E.E.O.C. v. Alton Packaging Corp., 901 F.2d 920, 923 (11th
Cir.1990) (production manager's statements to black employee that "you people
[**17]can't do a    thing right" constituted direct evidence); E.E.O.C. v.
Beverage Canners, Inc., 897 F.2d 1067, 1072 (11th Cir.1990) (overwhelming amount
of evidence of racial hostility, including barrage of racial slurs, was direct
evidence); Miles v. M.N.C. Corp., 750 F.2d 867, 876 (11th Cir.1985) [*642]
(statement by plant manager that he wouldn't hire blacks because "half of them
weren't worth a shit" was direct evidence).

    The only evidence that could possibly be described as "direct" is found in
the affidavits of former  Three Springs  employees offered into evidence by
 Carter  in opposition to  Three Springs'  motion for summary judgment. n5

PAGE 9

132 F.3d 635, *; 1998 U.S. App. LEXIS 81, **;

Case 0:00-cv-06139-DLG (BNA) Document 68pl. Entered on FLSD Docket 03/08/2001    Page 18 of 22

Most of the affiants' statements contain conclusory and generalized allegations of racial bias, much of which was properly struck by the district court. n6 But the affidavit of Margarett Allen, former Education Director at Three Springs, relates a conversation between her and Cook:

> During the time I worked at Three Springs, I reported directly to Pam Cook, who was then Program Director. Pam Cook admitted to me that she had difficulty in understanding Afro-Americans, and that further, her experience and interaction up to this time had been[**18] minimal with respect to black employees, and that Ms. Cook identified a bias against blacks and she found that they were difficult for her to trust or get along with.

The district court struck this portion of Allen's affidavit on the grounds that it is inadmissable hearsay. Carter argues that the statement by Cook in which she "identified a bias" constitutes an admission by the agent of a party-opponent and is "not hearsay" under Federal Rule of Evidence 801(d)(2).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

   n5 Carter also argues in his briefs that statistical evidence in the record should be considered direct evidence of discrimination allowing him to overcome his burden of production. Specifically, he cites the fact that Three Springs has never hired a black Program Director. Our cases are clear, however, that "statistics alone cannot make a case of individual disparate treatment." Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1131 (11th Cir.1984) (distinguishing individual cases from class action cases where statistics, if strong enough, can carry the plaintiff class's initial burden of production).


   n6 For example, statements by affiants that the Courtland facility "was a racially hostile environment," or that "there was a racially biased attitude by management towards minority black employees," were properly struck as conclusory.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -
[**19]

   We need not decide the evidentiary issue, however, because even if admissible, the statement does not amount to direct evidence. First, the statement as recorded in the affidavit is susceptible to more than one interpretation. Cook, in explaining her bias to a black colleague, could have been expressing a desire to get past such prejudices. We have held that statements that are open to more than one interpretation do not constitute direct evidence of racial discrimination. See Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1083 n. 2 (11th Cir.1996). Second, the statement does not relate directly to the decision to promote Carter to the position of Program Director. To say that Cook "identified a bias" to Allen is not the same as saying that Cook exercised that bias in the case of Carter's promotion. Direct evidence, by definition, is evidence that does not require such an inferential leap between fact and conclusion. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081-82 (11th Cir.1990) (evidence merely suggesting discrimination is not enough).

PAGE    10

132 F.3d 635, *; 1998 U.S. App. LEXIS 81, **;
Case 0:00-cv-06119-PCH Document 62 Empl. Entered on FLSD Docket 03/08/2001    Page 19 of 22
76 Fair Empl. Prac. Cas. (BNA) 488; 73 Empl. Prac. Dec. (CCH) P45,356

## B. Circumstantial Evidence

Carter claims that he produced circumstantial evidence that could allow a reasonable trier[**20] of fact to infer that Three Springs' decision not to promote him was racially motivated. In evaluating the evidence in the record, we are guided by the evidentiary framework announced in McDonnell Douglas, and its progeny. The plaintiff bears the initial burden of producing circumstantial evidence of racial discrimination and establishing a prima facie case. Under McDonnell Douglas, a plaintiff can satisfy this burden by proving that (1) the plaintiff is a member of a protected minority group; (2) the plaintiff was qualified for and applied for the promotion; (3) the plaintiff was rejected in spite of his qualifications; and (4) the individual who received the promotion is not a member of a protected group and had lesser or equal qualifications. See McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; Wu v. Thomas, 847 F.2d 1480, 1483 (11th Cir.1988). The establishment of the McDonnell Douglas elements is significant for two reasons: first, it creates a presumption of unlawful discrimination that the employer must rebut or lose as a matter of law; [*643]and, second, it means that the plaintiff has presented evidence allowing a reasonable trier of fact to infer unlawful[**21] discrimination. The burden then shifts to the employer to articulate legitimate nondiscriminatory reasons for the failure to promote. Successfully carrying this burden bursts the presumption of discrimination and leaves only the ultimate question--whether the employer's offered explanations are pretextual. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255 n. 10, 101 S. Ct. 1089, 1095 n. 10, 67 L. Ed. 2d 207 (1981); Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir.1997).

### 1. Prima Facie Case

Three Springs does not dispute that Carter is black, was considered for the promotion, and was rejected. They argued, and the district court agreed, that Carter was neither minimally qualified for the position of Program Director nor as qualified as Haynes for the promotion.

Initially, we must determine the minimum qualifications for the job of Program Director. It is clear from the testimony of Cook and McLemore, that of the three "position requirements" of education, experience, and special knowledge and skills, only education was treated as a minimum requirement. Both Cook and McLemore testified in their depositions that they considered education to be the[**22] minimum requirement that assisted them in initially selecting a pool of candidates to consider for the position. Furthermore, McLemore conceded that although Haynes and Baird were both hired for the position, neither possessed the required years of "clinical experience." Therefore, clinical experience cannot be considered to be a minimum qualification. Carter received his master's degree in 1966 from Indiana University in educational administration, meeting the education requirement and the "minimum qualification" for the position.

Even if Carter was minimally qualified for the position, Three Springs argues that he was less qualified than Haynes for the job. Considering the other two criteria--experience and special knowledge and skills--a reasonable trier of fact could find that Carter was equally qualified for the position. Carter argues, for example, that in his time as a Counselor at the Courtland facility

PAGE   11

132 F.3d 525  *;  1998 U.S. App. LEXIS 81 **;
76 Fair Empl. Prac. Cas. (BNA) 1633; 72 Empl. Prac. Dec. (CCH) P45,148

Case 0:00-cv-06119-PCH   Document 62   Entered on FLSD Docket 03/08/2001   Page 20 of 22

and in his time as a public school teacher and administrator, he amassed more
than the three to five years of "clinical experience" listed as a job
requirement while it is uncontested that Haynes did not. McLemore testified that
"clinical" in the job description referred to[**23] the "ability to make
judgments and recognize impaired behaviors and to intervene in that process."
Such activities were arguably in Carter's job description as a Counselor at the
Courtland facility, and he was arguably called upon to "make judgments" about
"impaired behaviors" as a public school teacher and principal. n7 Three Springs
argues that such experience is not relevant to the position of Program Director
because it took place amongst a "normal population." However, we will not add to
the objective requirements found in the Program Director job description,
especially considering our procedural posture.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

   n7 Both Cook and McLemore conceded that they did not investigate Carter's
experience as a public school teacher and principal to determine if it
constituted "clinical experience."

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -


   Three Springs  also argues that  Carter  did not have "administrative
experience in a psychiatric in-patient setting," while Haynes clearly did in his
position at the Courtland facility. Although  Three Springs  argues to the
contrary, [**24] this description may very aptly describe  Carter's  job as
a Counselor at the Courtland facility. In addition to following instructions
given by his supervisors, Carter was responsible for filling out reports and
supervising other Counselors as a shift supervisor. The drafters of the job
description may have intended something more, but shoddy drafting does not give
an employer license to redefine job requirements on the fly in an attempt to win
summary judgment. Three Springs can argue to the trier of fact that
"administrative experience" means something more than the experience that
 Carter  gained in his tenure at the Courtland facility.

   Finally,  Three Springs  argues that  Carter  does not possess the requisite
"special knowledge and skills" to be Program [*644] Director. Cook and
McLemore testified that Carter did not possess "exceptional verbal and written
skills" or the ability to "prepare written reports in technical language," but
there is little objective evidence in the record to support their conclusion. On
one occasion, Cook testified that she expressed concerns about Carter's written
notes in an annual evaluation. On the other hand, in Margaret Allen's
affidavit, she makes the following[**25] statement: "I also noted that Mr.
Carter adequately handled the vocabulary that was necessary in order to interact
with other employees." n8 Annie M. Cobb, at one time Carter's supervisor at the
Courtland facility, made the following statement in her affidavit: "He provided
good written documentation for his position." n9 Viewed in the light most
favorable to Carter, the evidence supports a conclusion that his written skills,
and his technical knowledge, were on par with those of Greg Haynes.


- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n8 The district court struck this portion of Allen's affidavit on the ground
that is was not relevant to the case. Because, in her capacity as Director of
Education, she was in a position to form an opinion as to Carter's ability to
use the relevant vocabulary, and because that opinion is relevant to the issue
of Carter's qualifications, it should not have been stricken.


n9 This sentence also should not have been stricken. As Carter's supervisor,
Cobb had personal knowledge of his written work, and her opinion is relevant to
the issue of his qualifications.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -
[**26]

As to the other "special knowledge and skills," they are too subjective to
allow for any meaningful comparison between Carter and Haynes. While there is
nothing inherently wrong with allowing decision makers to base decisions on
subjective criteria, we have found that "subjective evaluations involving white
supervisors provide a ready mechanism for racial discrimination." Miles, 750
F.2d at 871. For example, requirements such as the possession of "initiative and
judgement capabilities" and the ability "to relate to people in a manner to win
confidence and establish support" are incapable of objective evaluation. They
cannot be relied upon by an employer seeking to defeat the plaintiff's prima
facie case by showing that the plaintiff is less qualified than the applicant
chosen for the promotion.

2.  Three Springs' Rebuttal

As legitimate reasons for its failure to promote  Carter, Three Springs
repeats its arguments that  Carter  was not qualified for the position and that
Haynes was more qualified for the position. By articulating these reasons and
attempting to support them with evidence, Three Springs has carried its
intermediate burden and the presumption of racial discrimination[**27] drops
from the case. The burden now shifts back to  Carter  to show that  Three
Springs'  reasons are pretextual. If  Carter  has produced evidence casting
doubt on  Three Springs'  reasons, there is a jury issue.

3.  Carter's  Arguments of Pretext

We need not tarry long on this question, because it is clear that evidence
produced by Carter in support of his prima facie case creates a genuine issue as
to material facts, namely whether Carter was qualified for the position and
whether Haynes was more qualified than Carter. Additionally, we note that Carter
produced additional circumstantial evidence that does not neatly fall into the
McDonnell Douglas framework that, nevertheless, is relevant to the issue of
pretext.

For example,  Carter  proved that  Three Springs  had a policy of posting job
vacancies, not adhered to in this case. We have held that the failure to
promulgate hiring and promotion policies can be circumstantial evidence of
discrimination. See Harris v. Birmingham Bd. of Educ., 712 F.2d 1377, 1382-83
(11th Cir.1983). Certainly, it is even more suspicious where it is alleged that
established rules were bent or broken to give a non-minority applicant an edge

PAGE  13

Case 0:00-cv-06119-PCH  Document 62  Entered on FLSD Docket 03/08/2001  Page 22 of 22

132 F.3d 925, *; 1998 U.S. App. LEXIS 81, **;
76 Fair Empl. Prac. Cas. (BNA) 1695; 72 Empl. Prac. Dec. (CCH) P45,146

in the hiring[**28] process. See Morrison v. Booth, 763 F.2d 1366, 1373-74 (11th Cir.1985).

Additionally, several affidavits improperly stricken by the district court n10 related [*645] instances of alleged disparate treatment that could be relevant to a trier of fact in evaluating Three Springs' motives. For example, Tyrone Bowling, a former Counselor Aide, recounted an incident involving Cook:

I has a problem with respect to Ms. Cook in that there was an incident in which I was disciplined as a result of my talking with one of the adolescents about religion. This led to my termination, but a similarly situated white employee engaged in the same contact was not disciplined in any fashion.

Gregory Jones, an activity specialist, stated that he "was involved in an incident involving a written reprimand for a situation dealing with the escape of one of the adolescents, but a white employee, who also had the same offense, was not provided any written reprimand." Samuel Brewer, a Counselor Aide, stated that Carter and he "were paid less in [their] positions than other non-minorities who had lesser educational degrees." Ronnie Johnson, Counselor Aide, stated that he was asked "to be involved in[**29] the direct monitoring of another black ... employee in order to help assist management in getting information on this black employee so that they could terminate this person." Given the foregoing, Carter produced evidence that, if believed, could be found to cast doubt on the credibility of the reasons stated by Three Springs for hiring Haynes instead of Carter.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n10 In each affidavit, the affiant stated that he or she had personal knowledge of its contents. Furthermore, the following experiences of Three Springs employees are clearly legally relevant to the issue of pretext. These statements should, therefore, be considered to be part of the summary judgment record.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

IV. CONCLUSION

We emphasize that Carter has not yet proven his case. A reasonable trier of fact may well decide that Three Springs' decision makers believed that Carter was not, in fact, qualified for the promotion, or that Haynes was the most qualified candidate. We hold only that Carter has raised a genuine issue of material fact, through the[**30] production of circumstantial evidence, as to the motivation behind Three Springs' decision to promote Greg Haynes instead of Charles Carter. Therefore, we REVERSE the entry of summary judgment and REMAND to the district court for trial.

REVERSED and REMANDED.